KNOWLES (JONES v.). See Case No. 7,474.

KNOWLES (LOGANSPORT GASLIGHT & COKE CO. v.). See Cases Nos. 8,466 and 8,467.

## Case No. 7,897.

### KNOWLES v. NICHOLS.

[2 Curt. 571.] [1]

Circuit Court, D. Rhode Island. June Term, 1856.

INCORPOREAL RIGHTS—COMMONS—PLAT ACCOMPANYING DEED—TAKING OF SEA-WEED.

1. Though the words "rights, liberties, privileges, and appurtenances," are not effectual to create de novo, any incorporeal right, yet when a plat and the verbal description accompanying it show the metes and bounds of the land conveyed, and also that certain incorporeal rights of way, common, and the like, are annexed to and to be enjoyed with the land conveyed, and the deed refers to the plat for a more full description of what was intended to be conveyed, the incorporeal rights will pass with the land. An intention to create them de novo and annex them to the land is thus legally shown.

[Cited in Waterman v. Andrews, 14 R. I. 598.]

2. A grant of "common" in a particular tract of land, confers all such rights of common as this land is capable of conferring.

3. The taking of sea-weed from a beach may be a commonable right in Rhode Island.

[This was an action by Benjamin Knowles against John Nichols.]

Ames & Updike, Sr., for plaintiff.
Dixon & Sherman, contra.

CURTIS. Circuit Justice. This is an action on the case for the disturbance of a right of common, of sea-weed, and of taking sea manure, claimed by the plaintiff in a lot of land near Point Judith, in the state of Rhode Island. The case has been submitted to the court on a statement of facts, which embraces the title papers under which the plaintiff claims the right described in the declaration. The defendant claims no title in himself, and admits the taking and carrying away of the sea-weed mentioned in the declaration, without the license and against the will of the plaintiff; but he denies the title of the plaintiff to the commonable rights asserted by the plaintiff, in the declaration. These rights depend upon the construction and legal effect of a deed executed by Joseph Clarke, general treasurer of the state of Rhode Island, in De-

cember, 1785. It appears that a farm, containing about eleven hundred and sixty acres, situate in South Kingston, at Point Judith, had been confiscated during the war of the Revolution, and the legislature of the state at its June session, 1784, by a resolve, appointed a committee to lay it out into such a number of farms and lots, as might enable the state to sell the same to their best advantage and that of the purchasers; and the committee were to make a regular survey thereof, and report to the next general assembly. The committee reported accordingly, and showed the manner in which they had laid out the lands for sale by a plat, accompanied by a verbal description of what they had done. On the plat is shown a long and narrow lot, of a triangular form, said to contain ten acres, bounded by the sea on its longest line and including a beach, and on one of its sides on lot number five, and on the other by a lot of salt marsh. It is called on the plat "Common Lot." A drift-way to this lot is also shown on the plat. In their verbal report the committee, after describing the five farms, or lots into which they had divided the upland, and the manner in which they had apportioned the salt marsh between these upland lots, and after describing a highway which they had laid out through the farm and another highway to a fresh pond, "that every lot may have free access in case of drought," proceed to say, they have laid out "a lot of about ten acres on the south side of the marsh adjoining the sea and beach for a common, and laid out a drift-way, beginning at the west side of the highway at the dividing line between the lots numbered three and four, thence to run across the lot numbered four and across the corner of the lot numbered five to the elbow corner adjoining the salt marsh and across the corner of the marsh, that every lot might have free access to the marsh, and the common lot." Upon the coming in of this report, the general assembly resolved that the said tract of land be sold; and appointed a committee to sell the same, "in separate divisions, or lots agreeable to the said plat." The committee reported, that they had "sold the farms in lots agreeable to the said plat,"—and they give the name of the purchaser of each of the five lots of upland, with the proportions of marsh assigned thereto. Nothing is said as to the common lot. The general treasurer was empowered by the assembly to execute to each purchaser a deed conveying an estate of inheritance with warranty; and he executed this deed now before us, among others. All these proceedings which preceded the deed are made part thereof, not only by being recited in substance therein, but by the clause, "all and every thereof by the records and proceedings of the general assembly, reference being thereto had, will more fully appear." It is, therefore,

[1] [Reported by Hon. B. R. Curtis, Circuit Justice.]

the duty of the court to take these proceedings into view, in considering the meaning and legal effect of the deed, which professes on its face to be designed to carry into execution, the intent and purpose of the state and its vendees as manifested in those acts and proceedings.

The main argument on the part of the defendant is, that whatever may have been the purpose of the parties, this deed does not convey any commonable rights. That none are mentioned or described in the deed; and that the words rights, liberties, privileges, and appurtenances, are not effectual to create any corporeal right, though they may convey such as have a legal existence, and are annexed to the land granted. This is sound law, accurately stated and supported by many authorities. Whalley v. Tompson, 1 Bos. & P. 371; Grant v. Chase, 17 Mass. 443; Story v. Odin, 12 Mass. 157; Plant v. James, 5 Barn. & Adol. 791, in error, 6 Nev. & M. 282, 4 Adol. & E. 749. These are cases of ways, but the same law is applicable to commons. Grymes v. Peacock, 1 Bulst. 17. But the true inquiry here is, whether it does not sufficiently appear to have been the intention of the parties to create de novo, commonable rights in the ten acre lot, and to convey those rights annexed to the land conveyed by the deed. My opinion is, that when a plat and the verbal description accompanying it show the metes and bounds of the land conveyed, and also that certain incorporeal rights of way, common, or the like, are annexed to, and to be enjoyed with the land conveyed, and the deed refers to the plat for a more full and clear description of what was intended to be conveyed, the incorporeal rights, thus shown to be intended to be annexed to the land, will pass by the deed. In Barlow v. Rhodes, 1 Cromp. & M. 439, 3 Tyrw. 280, the court of exchequer expressed doubt whether any thing dehors the deed could be referred to for such a purpose. The grounds of that doubt are not explained, and I am unable to conjecture what they were. But it has been settled by repeated adjudications in this country, in conformity, I think, with sound principles, that where a deed refers to another writing for a description of what is intended to be conveyed, the latter may not only explain, but vary and add to the former, as if it had been incorporated therein. And this is, and long has been a settled rule, in conformity with which conveyancing has been carried on, in all parts of the United States. McIvers' Lessee v. Walker, 9 Cranch [13 U. S.] 173, 4 Wheat. [17 U. S.] 444; Jackson v. Parkhurst, 4 Wend. 374; Jackson v. Ransom, 18 Johns. 107; Jackson v. Freer, 17 Johns. 29; Bliss v. Branham, 1 J. J. Marsh. 200; Allen v. Bates, 6 Pick. 460; Foss v. Crisp, 20 Pick. 121. Citations might be greatly multiplied upon this point, but the rule is so generally understood and acquiesced in, that it is deemed needless.

We have therefore to consider two questions.

1. Whether the writings referred to in the deed, do show the intention of the grantor to create de novo, the commonable rights described in the declaration, and to annex them to the land conveyed? 2. Whether the deed so refers to these writings as to convey the incorporeal rights which they evidence?

The first of these questions seems to me to be free from serious doubt. The committee were directed to lay out the Point Judith Farm, so called, into such a number of farms and lots, as may enable the state to sell the same to the best advantage of the state and the purchasers. They laid out ten acres of the land into a "common lot." It is a necessary inference that this was done for the best advantage of the state and the purchasers; that is, that it was a common for the use of those who might become the purchasers of the five tracts of land, each of which would thus derive an advantage from it, and so the price would be enhanced, and the state thereby gain an advantage. I can perceive no other way in which the state and the purchasers could be benefited by having a part of the land in a common lot. This construction of their act is strengthened by what they expressly say in their report. They there say they have laid out this lot, which they describe by metes and bounds, "for a common, and laid out a drift-way, beginning, &c., running, &c., across the marsh, that every lot may have free access to the marsh and to the common lot." Here the intention is clearly shown to annex to each several farm, or lot, a right of way to the common lot; and no reason occurs to me, why this right of way should be annexed to each lot for the expressed purpose of free access to the common lot, unless there was also annexed to each lot, rights in the common lot. This conclusion is much strengthened by the proceedings which took place at the sale. The committee were required by the general assembly to sell the farm agreeably to the plat. If commonable rights in the common lot were to be annexed exclusively to the five farms or lots into which the upland had been divided, then, of course, no separate sale would be made of the common lot, the entire substantial value of this land being sold to the purchasers of these five farms or lots, the purchase-money whereof would enhance the value of this common lot. In such case there would be no more occasion for making a separate sale of this common lot, than of the land covered by the highways, or the drift-way, or the fresh water pond. But on the other hand, if no such commonable rights were thus to be sold, the committee could not execute their authority to sell the entire farm "agreeable to the plat," without selling this ten acres which was one of the lots shown on the plat and composing the farm. The committee reported to the assembly that they had "sold said farm in lots agreeably to the plat," and they returned an account of the sales, in which no notice is taken of the common lot,

any more than of the soil of the ways, or the fresh water pond. I think this report must be taken to mean, that they had sold the entire farm agreeably to the plat,—that such portions of the soil, as the plat showed were designed to be sold, had been sold together with such rights of way, water and common, as appeared by the plat to be designed to be annexed to those portions of the soil; but as to the remaining soil covered by the ways, by water, or subject to common, its whole value was embraced in the purchase-money of the farms or lots sold, and no separate sales had been made thereof.

The next question is whether this deed of the general treasurer so refers to these writings as to convey the incorporeal rights they evidence. It has been already remarked that the deed not only recites the entire substance of the proceedings, but expressly refers to the records of the assembly for all the particulars which they contain. It purports also in express words, to be made, "for and in virtue and by force of the said several in part recited acts of the general assembly,"—that is, in order to execute the contract of sale which the committee had made. We begin our examination of the words of conveyance used in the deed, with the knowledge of these important facts shown by the deed itself; that the state had sold, through its committee rights of common in the ten acre lot, annexed to each of the five lots, and that the purpose of this deed was to execute that sale of one of the lots sold. The deed then conveys lot No. 2, describing it by that name, together with that undivided proportion of salt marsh which had been assigned to this lot; it then shows how lot No. 2 bounds on the other lots, and proceeds to say: "For a further and more complete description of the aforesaid two hundred acres of upland, as well as of the twenty-seven acres and one ninth part of an acre undivided, of the said salt marsh, and the common lot of ten acres, reference being had to the map or plat thereof, the same will fully appear, together with all the ways, waters, rights, liberties, privileges, improvements, and appurtenances whatsoever to the hereby granted premises belonging, or in anywise appertaining." Now if this deed had begun by a recital that the state had sold to the grantee lot No. 2, and also as appurtenant thereto, certain described ways and water rights, and also commonable rights in a lot of ten acres, also described, there could be no doubt, I suppose, that a conveyance of the lot with its appurtenances, would pass these incorporeal rights. Such a deed would sufficiently evince an intention to create these rights and annex them to lot No. 2; the words "appurtenances thereto belonging," would be held to include these rights thus shown to belong to lot No. 2. And in my opinion this deed, by reciting the several acts of the committees, and of the assembly, and referring to the records thereof, does show that the state did make sale of lot No. 2 with these incorporeal rights annexed thereto

—that it was the purpose of the deed to execute that sale—and that by conveying the lot with the appurtenances thereto belonging, it must be taken to include those appurtenances which were made to belong to the lot, by being thus sold with it.

It was argued on the part of the defendant, that though this is called on the plat and in the report of the committee, a common lot, it does not appear, that the right of taking seaweed or sea manure was one of the commonable rights to be exercised thereon. In Kenyon v. Nichols, 1 R. I. 106, an action on the case was sustained, for disturbance of the plaintiff's commonable right in this very land by taking sea-weed therefrom. I consider it, therefore, to be the established law of the state, which seems to me consistent with sound principles, that the right to take sea-weed and sea manure from a beach, is a lawful, commonable right. It is true the designation of this lot is general; it is simply a common lot. But this must be taken to include all such rights of common as the land may be capable of supporting, and among them the right now in question. Whitelock v. Hutchinson, 2 Moody & R. 205. It was also argued that the supreme court of the state had decided (Knowles v. Nichols, 2 R. I. 198) that the general treasurer had not authority to convey the soil of this ten acre common lot, and that the title was now in the state. I am inclined to agree with that learned court in this conclusion, though I have not had occasion very fully to examine its grounds. But it is quite consistent with the rights claimed by the plaintiff, that the title to the soil should be in the state. The defendant, however, also insists that the rights of common also are in all the inhabitants of the state. What has been above said indicates my opinion on this subject. I will only add, that an intention to sell the whole of this farm in such manner, that it might produce the most money is plainly expressed; and there is nothing to indicate a design to reserve a part of it, for the use of the inhabitants of the state; a design very improbable in itself; since its remote and isolated position would render it impracticable for the people of the state, or any considerable part of them, to derive equal advantages therefrom. In pursuance of the agreement of the parties, judgment is to be rendered for the plaintiff for one dollar as damages.