SARAH G. CHASE *et al. vs* ALFRED W. CHASE *et al.*

NEWPORT—JULY 15, 1897.

PRESENT: Matteson, C. J., Stiness and Tillinghast, JJ.

Laches, in legal significance, is not mere delay, but delay that works a disadvantage to another.

This disadvantage may come from loss of evidence, change of title, intervention of equities, and other causes.

Mere lapse of time within the statutory limits does not constitute laches.

Delay in enforcing known rights until the condition of the other party has, in good faith, so changed that he cannot be restored to his former condition when the right is sought to be enforced, becomes inequitable and operates an estoppel against the assertion of the right.

When a court sees negligence on one side and an injury therefrom on the other, it is a ground for the denial of relief.

Laches is a defence that may be taken at any time.

BILL IN EQUITY to set aside a conveyance. Heard on respondents' motion for a new trial of issues of fact, after a verdict of a jury thereon in favor of the complainants.

STINESS, J. In August, 1877, Joseph Freeborn was the owner of real estate, consisting of about four acres of land and a dwelling-house, in Middletown, where he then lived with his wife, both being elderly people, and the husband paralytic.

They had no children, and wished to have some one come to live with and care for them. To this end, after like efforts with others had failed, he proposed to the respondents, then living in Brooklyn, Conn., to give them a deed of the property, if they would go there to live and attend to him and his wife as long as either should live. The proposition was accepted, a deed was made, reciting the consideration as above, and a lease for life was given both to said Joseph and Harriet Freeborn. Pursuant to this arrangement, the respondents went to live with Mr. and Mrs. Freeborn. Mr. Freeborn died in May, 1880, and his widow, Harriet Freeborn, continued to live upon the place until her death in October, 1893. During this period of sixteen years the respondents remained

upon the place, in execution of the contract and attending, more or less, to the wants of the aged people.

In October, 1894, the complainants, children of the devisees of Joseph Freeborn, brought this bill to set aside the convey-ance, upon the grounds that Joseph Freeborn was mentally incompetent to make the contract, and that the respondents did not properly care for said Freeborn and his wife; so that, the services being valueless, there was a failure of considera-tion for the deed.

Before the death of Mr. Freeborn, he and his wife removed from the house in which the respondents lived, to a small cot-tage near by, which he had built for greater convenience and retirement, and also for securing a lodging-room on the lower floor. So far as appears this was the voluntary act of Mr. Freeborn, who attended solely to its erection. We do not see in this fact, as is claimed by the complainants, a practical abandonment of the contract, nor such evidence of a failure of consideration as to avoid it upon that ground. If the aged couple preferred to be more by themselves than they could be in the larger house, with another family, and to avoid the necessity of going up and down stairs, they had the right to remove to the cottage. If such a course best suited them, and accorded with the requirements of care and comfort which they wanted, there would be no failure of duty on the part of the respondents on this account.

Issues of fact were framed, to be tried by a jury, whether Joseph Freeborn was of sufficient mental capacity to under-stand the nature and consequence of his act in giving the deed, of August 16, 1877, to the respondents, and whether he was so influenced by said Harriet Freeborn that the trans-action was not his free and voluntary act.

These issues were found in favor of the complainants, and the respondents moved for a new trial upon the ground that the verdict was against the evidence. On hearing this motion this court suggested the question whether, in view of the ap-parent laches of the complainants, they could maintain their bill ; and this is the question now before us.

Laches, in legal significance, is not mere delay, but delay

that works a disadvantage to another.   So long as parties are in the same condition, it matters little whether one presses a right promptly or slowly, within limits allowed by law ; but when, knowing his rights, he takes no steps to enforce them until the condition of the other party has, in good faith, become so changed that he cannot be restored to his former state, if the right be then enforced, delay becomes inequitable and operates as an estoppel against the assertion of the right. The disadvantage may come from loss of evidence, change of title, intervention of equities and other causes, but when a court sees negligence on one side and injury therefrom on the other, it is a ground for denial of relief.

The rule as thus stated is recognized in the following citations :   In *Wollaston* v. *Tribe*, L. R. 9 Eq. 44, Lord Romily said :   " Great stress was laid on the lapse of time ; but I think nothing of that, because all the persons interested are in the same state now as they were then.   If there had been any dealing which had altered the state of matters, that might have raised a question ; but there is nothing of the sort."   See also *Daggers* v. *Van Dyck*, 37 N. J. Eq. 130. Sir Barnes Peacock said, in *Lindsay* v. *Hurd*, L. R. 5 P. C. 221 :   " The doctrine of laches in courts of equity is not an arbitrary or technical doctrine.   Where it would be practically unjust to give a remedy, either because the party has, by his conduct, done that which might fairly be regarded as equivalent to a waiver of it, or where by his conduct and neglect he has, though perhaps not waiving that remedy, yet put the other party in a situation in which it would not be reasonable to place him if the remedy were afterwards to be asserted, in either of these cases, lapse of time and delay are most material."   In *Haff* v. *Jenney*, 54 Mich. 511, Cooley, C. J., said ;   " No doubt the relationship is a fact to be considered, and it might well be accepted as an excuse for some delay, not only because of the natural repugnance to making a charge of fraud against a near relative, but also because it might with some reason be hoped that such a fraud would on reflection be abandoned, and the fruits of it not claimed. But the delay in this case has been quite beyond what can be

excused on any such grounds as these.   Jenney, so far as we are informed, has never failed to claim the benefit of the arrangement made in 1868, and the parties now complaining have, for a period longer than that prescribed by statute for barring suit upon any personal demand, abstained from making any effective protest.   One could never feel a safe reliance in his conveyances if, after such a lapse of time, they could be suffered to be attacked on a stale claim of fraud.   The suggestion in the brief that the complainant rather than the defendant has been injured by the delay through the death of witnesses, is a begging of the question.   We cannot know this: we can only know that there has been delay until of necessity the facts have become obscure or the proof of them lost ; but whether this would tend to the prejudice of one party rather than the other is a matter of conjecture merely.   It is sufficient to justify a denial of relief that the moving party is responsible for the delay."   In that case there had been a delay of twelve years in moving to set aside a deed.

In applying these principles, which are so equitable as to commend themselves by mere statement, we find the following facts in the record.   Assuming, for the purposes of this opinion, that Joseph Freeborn was *non compos* at the time of making the deed, his condition was known to the complainants, and also the fact of the deed and the undertaking of the respondents to care for him and his wife during their lives. It was no secret, but was freely talked about among the relatives.   The relatives of Joseph Freeborn took no steps to have him placed under guardianship, nor made any objection to the continuance of the arrangement at his death, but acquiesced in it, by their silence at least, until the whole term of service had been completed.

The complainants deny the application of the doctrine of laches on the following grounds:

First, that it is waived by not pleading it.   While it is true that the respondents have not formally pleaded laches, they have shown the facts upon which it must depend.   They have asserted the making of the contract and the execution of it, all in good faith, as well as the competency and understand-

ing of Mr. Freeborn in making it. We know of no waiver on their part. It is a defence which may be taken at any time. It is true that when the court came to consider the case, and saw the apparent injustice of setting aside a deed after services rendered for sixteen years, when the respondents could not be put in *statu quo*, we suggested that this question be first disposed of. But that makes no waiver by the respondents.

Second, that *mere* lapse of time within the statutory limits does not constitute laches. To this we agree, as we have already stated.

Third, that there has been no laches. In 1856, Joseph Freeborn made a will in which he devised his estate to his wife during life, with remainder to two brothers and a sister. In view of this the complainants argue that they could not assert their right to the estate until the death of the widow in 1894, who by the will was a life tenant, and so there has been no laches on their part. We do not assent to this. When the testator died the rights of two of these complainants vested as children of devisees, and the third devisee was then living, whose right vested in his children, three of the complainants, within five years from the death of the testator. All of these parties in interest knew that the respondents were going on in execution of the contract. It was their duty to do something to apprise the respondents that they denied his right under the contract, and that they claimed the title to the land. We see no reason why they could not have maintained a bill to set aside the deed then as well as now. They had vested interests, and the life estate under the will was in no way connected with title under this deed.

The cases cited by the complainants to sustain their position are quite different from this one. Thus *Kirwan* v. *Kennedy*, I. R. 3 Eq. 472, was a bill by a remainder-man, in tail, against the administratrix of a life tenant, for an accounting to recoup the inheritance out of his assets for a part of the inheritance which had been sold under a mortgage, on account of a default of the life tenant to pay interest. Although the sale had taken place thirty years before, the court

held that no accounting could have been demanded until the death of the life tenant determined who was entitled to it. The interests in remainder were contingent and expectant; a very different thing from vested interests, as in this case.

*Orthwein* v. *Thomas,* 127 Ill. 554, is a complicated case, in which the facts do not very clearly appear, but what we find is this : That the land in question was accretion from the Mississippi river ; that the riparian estate had belonged to a Mrs. Osborn, and after her death to her husband for life ; that he had platted streets upon it, but, being river flats, it had not been in the possession of any one until ten years after his death, from which time Orthwein and his grantor had been in possession of it. In this suit Orthwein filed a cross bill setting up his title, and the town of Brooklyn claimed that he was guilty of laches in asserting his title. But the court said : "Being in possession, appellant might safely lie by until his possession was invaded or his title attacked." The distinction between such a case and the present is apparent.

In *Salter* v. *Bradshaw,* 26 Beav. 161, the complainant, who had sold a reversion, forty years before, was allowed to redeem it under the English rule that the burden of establishing that a full price has been given or a reversion lies upon the purchaser. The case bears lightly, if at all, upon the question before us.

But, aside from all this, the complainants cannot justify delay by reason of the life tenancy, because the widow was not in possession as life tenant under the will, but under the lease. Indeed, the complainants charge in their bill, and seek to prove by testimony, that she was the promoter of the scheme, the one who "planned and arranged it," and who exerted the influence upon her husband to bring it about. The lease being a part of this transaction, and she, if the charge be true, a participant, her life estate could in no way preclude a proceeding to set it all aside.

We think that the doctrine of laches applies in all the phases of the case. Witnesses must have passed away in sixteen years who could have testified to the condition of

Joseph Freeborn when the deed was made, and surely the testimony of the parties whether they were satisfied with their care, they being the ones to determine, is altogether gone. Meanwhile the complainants, relieved of the burden of caring for their aged relatives, allow the respondents to go on until both of the old people have died, and then they seek to upset the arrangement, and get the property themselves. They say, "We can do equity, because we can pay the respondents for what they did." But clearly an allowance for board, and sewing, and use of carriage, and general and special services and attendance, such as can now be recalled, would fall far short of equitable compensation. We cannot know, indeed we can hardly believe, that the service would have been undertaken on such a basis of payment. Sixteen years is a long part of a man's life to be given to the execution of a contract. What opportunities may have been lost by being tied to one place, and to the care of those who proposed to reward the service in another way, no one can tell. The respondent, Alfred W. Chase, was a school teacher, and this arrangement necessarily narrowed the field in which he could follow his profession. Up to the death of Mr. Freeborn he got very much less than he had before he made this contract. After his death, probably on account of a considerable release from the care required, he was able to go farther from his house and to earn, on the average, a little more than he received fifteen or twenty years before. But even if he earns more now, he cannot be put back where he was before, and it is not for us to conjecture whether he is better or worse off than he might have been. Through all those years these complainants, and those from whom they make their claim, stood by, without objection, allowing the respondents to spend their time and labor in expectation of the promised reward. No fraud is charged against them. The contract was not one of their seeking. If Joseph Freeborn was imposed upon, the bill charges that it was done by his wife, and not by these respondents. Under these circumstances it would be inequitable that the complainants may set aside the deed by paying the respondents for so many

meals, at so much apiece, and charges of that kind. They were silent when they should have spoken; and even if the verdict of the jury as to Joseph Freeborn's mental incompetency was correct, which there is strong reason to doubt, they have slept too long upon their rights to enforce them now, when we cannot do so without the possibility of doing injustice to the respondents. We think, therefore, that the bill should be dismissed.

*Darius Baker and Patrick J. Galvin*, for complainants.

*William P. Sheffield*, for respondents.