JOHN F. CAVANAGH *vs.* BOSTITCH, INC.

JULY 6, 1960.

PRESENT: Condon, C. J., Roberts, Paolino, Powers and Frost, JJ.

Powers, J. This is a bill in equity praying for an accounting and recovery of certain bonuses and royalties allegedly earned and remaining unpaid under the terms of a contract of employment, and further praying for damages for the alleged unlawful termination of the contract. The cause was originally heard in the superior court on the respondent's demurrer and a decree was entered sustaining the demurrer to that part of the bill relating to the second prayer and overruling the demurrer to the rest of the bill. Following a hearing before a superior court justice on bill, answer and proof a decree was entered denying and dismissing the bill

of complaint. The cause is before us on the complainant's appeal from both decrees.

The bill of complaint alleges and the answer admits that complainant, a resident of the city of Cranston, is and has been a professional engineer and inventor for a number of years; that respondent is the surviving corporation of a merger consummated on or about November 1, 1948 between itself and Boston Wire Stitcher Company, a corporation organized under the laws of the State of Maine, hereinafter sometimes called respondent's predecessor; and that respondent is a substantial manufacturer of stapling machines, staplers, stapling pliers, hammers and preformed wire staples for loading into stapler machines.

It is further alleged and admitted that from about November 1, 1931 until December 11, 1941 complainant was employed by respondent's predecessor, during which time he was responsible for certain inventions on which letters patent were issued on the application of complainant and assigned by the latter to respondent's predecessor; that not all of these inventions are material to this suit, but that the patents relating to and designated as the G-1 staple remover, the H-2 hammer, the P-1 plier, the P-4 plier, the T-5 tacker, the crown staple, the B-8 stapler and the B-5 desk stapler manufactured by respondent's predecessor are material to complainant's claim, respondent admitting that bonuses were paid to complainant on the first five of these items and that no bonus was paid on the remaining three; that on or about April 7, 1937 complainant and respondent's predecessor negotiated a contract of employment retroactive to February 1, 1937 and incorporating the provisions of an agreement between complainant and respondent's predecessor dated June 7, 1932.

The contract of April 7, 1937 is hereinafter set out in full in Appendix A, and the June 7, 1932 agreement, incorporated by reference, appears in Appendix B.

The bill further alleges that the total amount of sales was approximately $12,000,000 and that the bonuses earned amounted to $120,000, but that complainant received less than $4,500 in bonuses, and that respondent has assumed responsibility for the obligations of its predecessor to complainant. The respondent admits its responsibility for the obligations of its predecessor and that the total amount of bonuses paid was less than $4,500, but denies that complainant earned bonuses in the amount claimed.

The complainant also alleges that he relied on certain oral representations made by Joseph D. A. Whalen, president and treasurer of respondent's predecessor, contemporary with the execution of the April 7, 1937 contract, that Whalen knew of "one patent wherein I had lost out, but to bear in mind that now I was dealing with honorable men. Now that I was dealing with honorable men, that my royalties would exceed my—would be the big part of my income; that the contract was something to be put away in a drawer and forgotten."

The record establishes that in accordance with the terms of the contract complainant received his first statement of the bonus earned in August 1937 and succeeding statements at the expiration of six-month periods until the termination of his employment; that there were a total of ten such statements, none of which remained in the possession of complainant; that each such statement was accompanied by a check for the amount alleged to be due, which checks were promptly cashed by complainant; that copies of these statements were not preserved by respondent or its predecessor; and that the only record thereof remaining in the files of Ernst & Ernst, respondent's accountants, relates to the period covered from August 1, 1941 to the termination of complainant's employment.

It appears from the record that the bill of complaint was filed on June 25, 1957, within thirty-six days of twenty years from the date of the August 1, 1937 statement and

approximately fifteen years and eight months from the notice of November 1941 terminating complainant's employment.

The bill prays:

"1. That this Court order an account to be taken of the moneys received by the Respondent's predecessor, during the period of Complainant's employment, from the sale of all patented devices invented by the Complainant, as provided in said covenant and agreement; and that a decree be entered ordering the Respondent to pay to the Complainant such sums as may be thereby determined to be due the Complainant together with interest and costs.

"2. That this Court enter a decree either

"(a) Ordering that an account be taken of the moneys received by the Respondent's predecessor and the Respondent from the sale of each patented device invented by the Complainant, during the period commencing at the termination of the Complainant's employment and ending at the expiration of said patent; and ordering the Respondent to pay to the Complainant one per cent (1%) of the amount of such sales, together with interest and costs; or

"(b) Ordering the Respondent to pay to the Complainant damages in such amount as the Court may determine to be fair by reason of the termination by Respondent's predecessor of the Complainant's employment; or

"(c) Ordering the Respondent to pay to the Complainant the reasonable value of the patented inventions assigned by the Complainant to the Respondent's predecessor, less such amounts as have heretofore been paid to the Complainant, together with interest and costs.

"3. That the Respondent, its agents and servants, be restrained *ex parte* and enjoined during the pendency of this cause from destroying or otherwise disposing of books, records, documents and memoranda pertaining to the matters referred to in the Bill of Complaint.

"4. That the Complainant may have such other and further relief as the nature of the case may require."

The respondent's demurrer, filed August 1, 1957, sets forth in substance that complainant's bill alleged no facts on which he was entitled to relief; that it admitted receipt of all payments to which he was entitled; that items for which he claimed credit were not devices within the meaning of the agreement; that his claim accrued within the period between February 1, 1937 and December 11, 1941, as disclosed by the clear terms of the agreement and incorporated as part of complainant's bill; that he alleged no facts explaining the delay in making his claim; that such unexplained negligence constituted laches; that his second prayer for relief rests on allegations clearly contradicting the terms of the written agreement and on oral representations made prior to or contemporaneously with the execution of the written contract; and that complainant has a full and adequate remedy at law.

The pleadings were argued before a superior court justice on December 9 and 10, 1957, and thereafter a decree was entered March 7, 1958 sustaining the demurrer as it related to the allegations in support of the second prayer of the bill and overruling the demurrer as to all other allegations.

In his reasons of appeal complainant first contends that the decree of March 7, 1958 and the decision in support thereof are erroneous in that they are against the law. The trial justice did not misconceive the allegations on which complainant relied in support of his second prayer for relief. He properly found that the terms of the contract were not ambiguous; that respondent was within its rights in terminating complainant's employment; that no bonuses could be earned by complainant after he had ceased to be employed by respondent, since the contract was terminated after February 1, 1940; and that any oral representations made to complainant, whether in explanation of the terms of the contract or for the purpose of inducing complainant to enter into the agreement, were made prior to or contemporaneously therewith and hence were barred by the

rule against parole evidence, citing *Quinn* v. *Bernat*, 80 R. I. 375, *Allen* v. *Marciano*, 79 R. I. 98, *Gaddes* v. *Pawtucket Institution for Savings*, 33 R. I. 177, and quoting from *Myron* v. *Union Railroad Co.*, 19 R. I. 125, 126. We are of the opinion that this contention is without merit.

On April 4, 1958 respondent filed an answer incorporating therein a motion that complainant's bill be denied and dismissed. By a decree dated July 11, 1958 respondent's motion to dismiss was granted as to the allegations in support of complainant's second prayer; otherwise it was denied. The complainant contends under his second reason of appeal that this was error. In our opinion, for the reasons set forth in the discussion on the appeal from the decree of March 7, 1958, this contention is without merit.

On October 20, 1958 and intermittently thereafter on various dates through January 26, 1959, that portion of the bill in support of complainant's first prayer was heard by a superior court justice on answer and proof. It appears from the record which is voluminous as to testimony and exhibits that during the ten-year period in which complainant worked for respondent's predecessor, he applied for and was issued numerous letters patent which he assigned to his employer; that eight of these patents issued by the patent office between December 19, 1933 and September 22, 1936 were apparently relied on by respondent's predecessor in the improvement of existing devices and the manufacturing of new devices; that respondent's predecessor had paid no bonus on three of these patents in the belief that it was not obligated to do so; and that although complainant had received a total of ten statements during the course of his employment, all of which omitted any reference to the three patents in question, complainant nevertheless made no complaint to his employer regarding the omission.

It is undisputed, however, that complainant sought legal advice on three separate occasions and from different counsel regarding what he considered an inadequate return on

his inventions according to the terms of his contract. The complainant testified that he first sought advice of a counsel toward the end of his employment because he felt he was "being gypped * * *." It appears that on that occasion counsel suggested that since younger men were graduating from engineering schools and complainant appeared to be doing well and believed that his employment was permanent, it might be just as well to leave things as they were. The complainant states that he considered this as advice of counsel and followed it. Shortly after the contract was terminated he consulted another attorney who advised him that he would take the case, but that the litigation and preparation therefor would be both lengthy and expensive. The complainant testified that since he had neither time nor money he did not pursue the matter further at that time. Still later, in 1947, he consulted a third attorney and was advised that his claim was barred by the statute of limitations.

It further appears that although complainant apparently did not discuss the question of his bonuses with any representative of respondent's predecessor, he did ask the president-treasurer Joseph D. A. Whalen for an appointment on two occasions. The first occurred at a street intersection "in Washington Park" and the second in the lobby of the "Industrial Trust Company building." The meeting place on each occasion appears to have been designated by Whalen and the subject of conversation during both discussions related to the two-year prohibition against complainant working for a competitor of, or in competition with, respondent's predecessor. The complainant testified that on each occasion Whalen refused to waive the provision.

The testimony and documentary evidence establishes that in November 1933 complainant and respondent's predecessor entered into a contract of employment, whereby complainant was to be paid a stipulated weekly wage and a

bonus of 5 per cent of the profits resulting from the sale of devices invented by complainant, and proportionately as to devices in which complainant collaborated with others, but in such amount, if any, as the bonus should exceed the stipulated salary. This contract, like the subsequent agreement of 1937, was subject to the auditing reports of Ernst & Ernst, and was terminated on January 24, 1935 after complainant had complained that since said reports showed no profits, the contract offered no incentive to him. The 1933 contract is immaterial to the present suit, except as it sheds light on the attitude of the parties in negotiating the agreement which is the subject matter of this litigation.

Thereafter complainant worked on a day-to-day or week-to-week basis without a contract until some time prior to April 1937, when he advised Whalen that he was thinking of obtaining other employment. The complainant testified that Whalen assured him that there was no need to do this and as a result the contract of April 7, 1937 was negotiated. It is admitted by respondent that this contract was drawn by its attorneys.

George A. White, Jr. testified for respondent that he was a patent attorney, registered with the United States patent office, and had acted on behalf of respondent and its predecessor since 1922; that he had supervised complainant's applications for the letters patent issued to him and the assignment of the patents to respondent's predecessor; that imprinting of patent numbers on devices of respondent's predecessor was done at his direction, including those invented or developed by complainant; and that false imprinting or marking constituted a criminal offense.

J. Arnold Lundgren testified that he was a partner in the auditing firm of Ernst & Ernst; that his firm did the accounting for respondent and its predecessor; that he was with the firm during the period of the contract in question and had personally worked on the account; that he had searched through his firm's records for data on the Cavanagh account

but was able to discover work sheets relating to the period from August 1, 1941 to December 15, 1941 only and that in his opinion an accounting could not be reconstructed from the available records. He admitted that the Ernst & Ernst accounting did not include a determination of which devices applied to the contract, relying for that on information supplied by their client. He acknowledged that the statements prepared for complainant did not include any reference to the crown staple or the B-5 desk stapler, two items claimed by complainant to be devices invented by him.

Walter R. Walker, treasurer of respondent corporation, testified that a search of the company records turned up no copy of any of the statements given to complainant, but that the cashbook disclosed a memorandum of ten canceled checks covering the period of the contract, amounting to $3,167.20; that these payments were for bonuses; and that the company had moved twice and some records were lost and many purged, including those relating to complainant.

The principal witness for respondent was Joseph D. A. Whalen, who testified that he first engaged complainant in 1931; that complainant did not object at any time to the omission from the statements of any reference to the three items in issue; that the crown staple was mostly Whalen's idea; that in the two conferences with complainant, after the latter's employment had been terminated, no claim was made for bonuses on the crown staple; and that the price of that staple varied from time to time and was fixed by two employees since deceased, but he admitted that he made the final determination of prices. He further testified that he was responsible for determining the amount of bonuses earned by complainant, but could not remember whether he had discussed with his attorneys which of complainant's patents entitled him to a bonus; that sales of the three items on which no bonuses were paid were made mostly to respondent, a selling corporation; that its stock was wholly

owned by Boston Wire Stitcher Company, respondent's predecessor; that he was president of both corporations; and that their offices were in the same building. He contradicted complainant's testimony repeatedly and offered to show that the word "devices" as contained in the contract had a special meaning in the trade. The testimony relating to the sales to respondent was elicited in cross-examination for the purpose of ascertaining whether these were sales to "customers" as the word was used in the contract.

The record contains a large number of exhibits offered by complainant and respondent and is replete with technical testimony relating to patents, manufacturing processes, sales and accounting practices. A substantial portion of the testimony and exhibits is essential to the question of whether complainant is entitled to the accounting for which he prays, but much of it by the very nature of the case would be probative in an actual accounting.

The trial justice in reaching his decision indicated that the three items on which bonuses were not paid were "devices" within the meaning of the contract which is the subject of this litigation and expressly ruled that the sale of these items between Boston Wire Stitcher Company and Bostitch, Inc. were not sales between the former and its customers on which a bonus of one per cent was to have been paid. Still later the trial justice stated, "Therefore, when the complainant received an account which purported to be an account rendered under the terms of this contract, he did not receive an account which the contract called for." It was his conclusion, therefore, that in the absence of any other defense, complainant would be entitled to relief. However, relying on *Chase* v. *Chase,* 20 R. I. 202, and quoting extensively therefrom the trial justice held that complainant was guilty of laches as defined in that case and denied and dismissed the bill.

We are of the opinion that the circumstances of the instant case, as to the injury or hardship which will be suf-

fered by respondent, are so readily distinguishable from the facts in the *Chase* case on which the trial justice based his decision that it is not to be governed thereby. The trial justice, in giving his decision and apparently alluding to arguments made by counsel, referred to the principle of accord and satisfaction, and also spoke of an account stated. Counsel for complainant and for respondent have argued here, in support of their respective positions, the theory that the decision of the trial justice may have been reached on the principle of accord and satisfaction, of an account stated, or of laches.

It seems to us he clearly intended to indicate that the course of conduct between the parties was merely in the nature of accord and satisfaction or an account stated, but so much so as to warrant an assumption by respondent that its account with complainant was closed and that it should not, almost twenty years later, be asked to give an accounting in a court of equity. The trial justice stated, "The complainant received the proceeds of that account time after time, and the respondent had a right to believe that he agreed in fact that that account was correct, and I think now, in 1956 and 1957, when the bill was filed, I think it is too late to bring the bill to revive that same account."

In any event we are of the opinion that the principle of accord and satisfaction is not applicable, since there is no evidence that the checks were accepted in settlement of a disputed claim. *Hull* v. *H. A. Johnson & Co.*, 22 R. I. 66. Although complainant's first prayer for relief relates to items which, assuming without deciding, may have been subject to the defense of an account stated, nevertheless in his brief he asks this court for recovery of unpaid royalties on three items to which no reference was made in the so-called accounts rendered. It therefore follows that the principle of an account stated is likewise not applicable. *Hall-Vesole Co.* v. *Durkee-Atwood Co.*, 227 Minn. 379.

He recognized that the cause was one in which there was concurrent jurisdiction in equity and law, noting that the contract was a covenant and that the applicable statute of limitations in an action at law was twenty years. But again referring to the *Chase* case, the trial justice stated, "It [the statute of limitations] is to be considered, of course, but the fundamental thing to be considered is whether or not the parties can try their equity case as if it had been tried at the time of the actual occurrence, at the time the actual event happened, and if it cannot be so tried, *and the respondent will suffer by reason of the failure to press it,* whether the statute of limitations has run or not, the complainant cannot prevail." (italics ours)

It is apparent from an analysis of his decision that he was much impressed by the reasoning of this court in *Chase* v. *Chase* in that the respondents there could not be restored to the position or status that they occupied at the time the deed in question was executed. There the respondents gave up their home in another state, together with the opportunity for advancement in the community where they were known, and for sixteen years submitted to a less favorable environment for success in the fulfillment of their obligation to care for the elderly couple with whom they had contracted.

Equating the circumstances of said respondents to those of respondent here, the trial justice commented that if complainant on receiving his first statement and the accompanying check in August 1937 had thereupon complained to respondent's predecessor that bonuses were not being paid for the items now claimed, his employer might then have decided that the compensation was considerably more than it had intended to pay and thereupon terminated the contract. The trial justice concluded that respondent in the instant cause cannot be restored to that position if complainant's prayer for relief were to be granted. We do not conceive the cases to be wholly analogous.

The terms of complainant's contract are such that if he had made the representation to his employer in August 1937, as suggested by the trial justice, and complainant's employment had thereupon been terminated, respondent's predecessor would still have been liable for bonuses to February 1, 1940. Thus for a period slightly in excess of three fifths of the time during which the contractual obligation existed, respondent's predecessor could not have changed its position with relation to the bonus payments, and to that extent, in the absence of other circumstances, complainant's failure to complain results in no hardship to respondent.

However, respondent contends that material records have been lost or destroyed, that two essential witnesses have since deceased, and that memories have become faulty over the years and are no longer reliable. Offsetting these normally persuasive circumstances is the testimony of Arthur F. Palmer, a partner in the firm of Ward, Fisher & Company, certified public accountants. Palmer testified that he had thirty-five years' experience and that he was familiar with accounting practices of manufacturing companies. At the suggestion of the court that an independent accountant be engaged to determine whether an accounting as prayed for by complainant were possible, Palmer was selected by the parties. From the files of respondent corporation and the exhibits in evidence he prepared a list of available records on the basis of which he testified that in his opinion an exact dollar accounting was not possible, but that it was possible to reconstruct a reasonable accounting.

In our opinion the testimony of the witness Palmer is persuasive on the issue of whether the loss or destruction of records, of faulty memory, or the unavailability of witnesses precludes an accounting within the scope of equity. We do not think that exactness should be the test in granting equitable relief.

We are in accord with the decision of the trial justice that the three items, the crown staples, the B-8 staplers and the B-5 desk staplers, are "devices" within the meaning of the contract and that the sales to Bostitch, Inc. were not sales to the customers of Boston Wire Stitcher Company within the meaning of the agreement. Viewed in this light, it is our opinion that complainant is entitled to an accounting on the sales of the three items in issue by respondent's predecessor to its customers for the period from February 1, 1937 to February 1, 1940.

There is no evidence here of hardship in the sense that respondent has been placed at a disadvantage. There is only delay and this court has repeatedly held that mere delay does not constitute laches. In denying a claim of laches where complainant sought an accounting after thirteen years, we stated in *Goff* v. *United States Fidelity and Guaranty Co.*, 72 R. I. 363, at page 371, "It does not appear in evidence that the respondent surety, because of the delay, had suffered any disadvantage, or had changed its position, or that it cannot reasonably make up an account which will fulfill its duty under this decree in accordance with the terms of the indemnity agreement. As the record stands, the surety depends merely on the lapse of time * * *. Ordinarily mere lapse of time is not enough to support a claim of laches. It has been held by this court that in legal significance laches is not mere delay but delay that works a disadvantage or prejudice to another. *Chase* v. *Chase*, 20 R. I. 202; *Oldham* v. *Oldham*, 58 R. I. 268, 284."

With respect to the complainant's prayer for interest, however, we are of the opinion that the delay was prejudicial to the respondent. If the complainant had pressed his claim seasonably, there would not now be any question of substantial interest almost if not equalling the principal amount involved.

The complainant's appeal is sustained, the decree appealed from is reversed in part, and on July 11, 1960 the

parties may present for our approval a new decree, in accordance with this opinion, for entry in the superior court.

FROST, J., dissenting. In all deference to my associates I am unable to concur in the opinion reached by the majority.

The complainant is a highly intelligent man as evidenced by the work he is doing and has been doing for some years. He was cognizant for many years of the situation which prompted him to bring the present suit. As early as 1941 he consulted an attorney and afterward two others, all competent lawyers, but took no action. Why he did not is best known to himself. After nearly twenty years he filed the present suit in equity.

As a result of complainant's long delay, many of respondent's records no longer exist, and it is reasonable to assume that the memories of those who might be called to testify have become dim. The trial justice among other reasons gave laches as a reason for denying and dismissing the bill.

I think the appeal should be denied and dismissed on the ground of laches.

CONDON, C. J., concurs in the dissenting opinion of Mr. Justice Frost.

### APPENDIX A

"This Agreement made and entered into by and between Boston Wire Stitcher Company, a corporation organized under the laws of the State of Maine, doing business in the City of Warwick, in the State of Rhode Island, hereinafter referred to as 'the Company,' and John F. Cavanagh, of the City of Providence, in said State of Rhode Island, hereinafter referred to as 'Cavanagh,'
"Witnesseth:
"That Whereas on or about June 1, 1931, the Company employed Cavanagh for the specific purpose of inventing a new and original improved type of stapling machine, and has retained Cavanagh in its employ continuously thereafter, paying to him large sums of money in compensation for his services; and

"Whereas Cavanagh desires to remain in the employ of the Company upon the terms and conditions hereinafter set forth, and the Company is willing to continue his employment upon such terms and conditions, thereby affording Cavanagh an opportunity to perform engineering services which may result in new and original inventions;

"Now, Therefore, in consideration of the premises and of the mutual covenants and conditions hereinafter contained, the parties hereto, each for himself or itself, and for his or its respective executors, administrators, successors and assigns, covenant and agree as follows:

"First: The Company hereby employs Cavanagh as inventor for the period of one (1) year from February 1, 1937, and will pay to him as such inventor a minimum salary of One Hundred Twenty-five Dollars ($125) for each week during the term of his employment as such inventor, and also the bonus, if any, specified in paragraph Third hereof. Said employment is subject to termination in the manner and for the causes set forth in paragraph Fourth hereof, and, if not theretofore terminated, shall continue after the expiration of said one (1) year period until it shall have been actually terminated in the manner provided in said paragraph Fourth.

"Second: Cavanagh will devote the whole of his time, attention and energy to and will use his best efforts and interest in the performance of his duties as an inventor. He will not engage directly or indirectly in any other business, except as may hereafter be mutually agreed. The agreement with the Company signed by Cavanagh under date of June 7, 1932, relative to property rights in inventions and disclosure of confidential information is hereby incorporated in this agreement and ratified and confirmed as applying to the employment herein set forth, a copy of said agreement being attached hereto and marked 'Exhibit A.'

"Third: In addition to the minimum salary of One Hundred Twenty-five Dollars ($125) per week specified in paragraph First hereof, Cavanagh shall receive during the period of his employment and thereafter as herein specified, as additional compensation, a bonus equal to one per cent (1%) of the amount paid to the Company by its customers as the purchase price from the sale to such customers

of devices invented by Cavanagh for which letters patent of the United States and elsewhere have been or may hereafter be issued to the Company upon the application of Cavanagh duly assigned to the Company, such selling price to be fixed by the Company and its customers as they may agree without interference from Cavanagh. In the case of devices invented by Cavanagh in collaboration with one or more other parties in respect to which application for letters patent shall have been or may be made in the name of Cavanagh and such other party or parties and/or in the case of devices which are not solely the invention of Cavanagh and incorporate other inventions not made by Cavanagh, said bonus shall be computed on the basis of such portion of one per cent (1%) of said purchase price as the parties hereto may in each case agree upon from time to time. The Company may deduct an amount equal to one half of all costs, attorneys' fees, expenses, damages and/or liability incurred or suffered by it in connection with or in support or defense of any of the inventions or improvements perfected by Cavanagh, patented or otherwise, from any bonus otherwise payable to him hereunder on account of sales of any device incorporating the invention in connection with which such expense was incurred, but no such deduction shall be made from any bonus payable on account of the sale of devices which do not incorporate such invention. An accounting shall be had as of August 1, 1937, and at the end of each six (6) months' period thereafter or upon the sooner termination of this employment, and the amount of the bonus, if any, computed as aforesaid, shall be paid to Cavanagh forthwith; provided, however, that in the case of devices incorporating improvements invented by Cavanagh for which applications for letters patent may be pending but no letters patent shall have been granted or refused, or incorporating improvements for which letters patent shall have been granted hereafter but in respect to which there is, in the opinion of the Company, danger of litigation and possibility of liability on its part, the Company may in its sole discretion retain such part of any such bonus as it shall see fit, paying to Cavanagh, when, and only when, it shall deem the rights of the parties to have been finally determined, that portion, if any, of the amount so retained remaining after the payment of one half of the damages

and expenses attendant to such proceedings as aforesaid. Upon the termination of this employment, all right of Cavanagh to receive the minimum salary and bonus aforesaid shall cease, except that, if terminated prior to February 1, 1940, he shall continue to be entitled to receive the bonus on account of such sales during the period from the date of such termination to February 1, 1940, but not thereafter. The certified statement of Messrs. Ernst & Ernst, or other certified public accountants from time to time employed by the Company, as to the amount of such bonus due for any such accounting period, determined by them in good faith in accordance with the provisions hereof, and subject to the aforesaid discretionary right of the Company to retain portions thereof, shall be final and binding upon the parties hereto.

"Fourth: The employment created by this agreement shall cease and terminate upon and after the expiration of a period of fourteen (14) days after written notice shall have been served by the Company upon Cavanagh or by Cavanagh upon the Company, provided that no such notice shall be served prior to January 14, 1938. Nothing herein contained shall limit the right which is hereby expressly reserved in, to or by the Company and conceded by Cavanagh to terminate this agreement forthwith at any time for any dishonesty, incompetence, negligence, inattention, irresponsibility, or incapacity on the part of Cavanagh. In the event of the termination of this agreement as aforesaid, or by reason of the death of said Cavanagh, the amount due to Cavanagh or to his estate, as the case may be, for salary and/or bonus shall be fixed and determined as of the date of such termination.

"Fifth: Upon the termination of this agreement or any extension thereof or of any other employment of Cavanagh by the Company, Cavanagh will furnish the Company with all information and data in his possession which may be useful and/or beneficial in the conduct of its business and will deliver to the Company all books and records in his possession relating to its affairs.

"This instrument, executed in duplicate, together with the aforesaid agreement dated June 7, 1932, contains the entire agreement of the parties hereto relating to the employment of Cavanagh by the Company and shall become

effective upon the execution and delivery hereof and as of February 1, 1937.

"In Witness Whereof, the parties hereto have hereunto and to a duplicate original hereof set their hands and seals, the said Boston Wire Stitcher Company by Joseph D. A. Whalen, its President and Treasurer, thereunto duly authorized, this 7th day of April, A. D. 1937, but as of February 1, 1937.

"In presence of:

[signed] Margaret E. Dubois (Witness for both)

Boston Wire Stitcher Co.
per [signed]
   Joseph D. A. Whalen,
           President
[signed]
   John F. Cavanagh"

## APPENDIX B

"Exhibit A

"Boston Wire Stitcher Company
   East Greenwich, R. I.

"Gentlemen:

"In consideration of my employment by your company I hereby agree that all inventions, improvements and discoveries made by me relating to the products from time to time manufactured and/or sold by your company, its subsidiaries or associates, or to the business, processes, machinery and methods of production and manufacture thereof, made by me while in your employ under the present or any subsequent arrangement or during the period of two years after leaving your employ, shall become your property, and that I will promptly disclose the same and upon request without further consideration, will apply for letters patent at your expense and assign all my interests therein to Boston Wire Stitcher Company, its successors and assigns. I also agree that I will not divulge to others any confidential or secret information concerning your company, its customers and/or methods, nor will I, for two years after leaving your employ, engage in, or render service to others engaged in the manufacture and/or sale of any products which compete with those manufactured and/or sold by your company, its subsidiaries or associates.

"June 7, 1932.          (Signed) John F. Cavanagh"

## MOTION TO REARGUE.

### JULY 26, 1960.

PER CURIAM. After our opinion herein was filed, the respondent by permission of the court presented a motion for leave to reargue, setting forth therein certain reasons on which it bases its contention that justice requires a reargument of the cause.

Upon consideration, we are of the opinion that only the following points are of sufficient importance to warrant a reargument: Point 3 with reference to the matter of the accounting, point 4 with reference to the applicability of the principle of accord and satisfaction, and point 5 with reference to the applicability of the principle of account stated.

As thus limited, the motion for leave to reargue is granted.

*Higgins, Cavanagh & Williamson, Joseph V. Cavanagh, Harold E. Adams, Jr.,* for complainant.

*Tillinghast, Collins & Tanner, Edwin H. Hastings,* for respondent.