DECISION
Presently before this Court are C. A. No. 98-2953, Marc A. Cote, et al. v. Edward Inman III in his official capacity as Secretary of State, and C. A. No. 01-2949, Lincoln C. Almond in his official capacity as Governor of the State of Rhode Island v. Edward S. Inman III, in his official capacity as Secretary of State.
The original lawsuit originated out of a complaint for declaratory and injunctive relief by the Plaintiffs, Marc A. Cote, State Senator; Sandra Mellen, Chair of the Voter Initiative Alliance, a political action committee; and Robert Arruda, Chair of Operation Clean Government. The named Defendants in the original action were Governor Lincoln C. Almond ("Governor"), in his official capacity as Governor of the State of Rhode Island, and Edward Inman III ("Secretary of State"), in his official capacity as Secretary of State of the State of Rhode Island. The Attorney General and the General Assembly intervened as Defendants. According to Plaintiffs, Article 14, Section 2 of the Rhode Island Constitution was violated in 1994, and based on the alleged violation, the Plaintiffs seek a judicial order directing Governor Almond to establish a bipartisan preparatory commission and an order compelling the Secretary of State to place on the ballot at the next general election, 2002, the question: "Shall there be a convention to amend or revise the constitution?"
This Court, in a Decision filed on September 27, 2000, a copy of which is appended hereto, granted the motions of the General Assembly and the Attorney General to dismiss said action because it found the Plaintiffs, Marc A. Cote, Sandra J. Mellen and Robert P. Arruda, did not have the requisite standing to seek the specific relief requested. The Plaintiffs appealed the Court's decision to the Supreme Court of Rhode Island which, a single justice ordered:
 1. This case shall be remanded to the Superior Court for the purpose of allowing Governor Almond to file a motion with the Superior Court seeking to realign himself as a plaintiff and to be dismissed as a party defendant. It is requested that this motion be assigned for hearing on an expedited basis.
 2. In the event that this motion is granted, the Superior Court may then proceed to address the case on its merits including the issue of the Governor's standing to seek a remedy as set forth in the plaintiffs' complaint. It is further requested that this hearing be assigned and that it take place on an expedited basis.
 3. At the conclusion of the hearing in the Superior Court any party who is aggrieved by the judgment which the Superior Court will enter may appeal to this court.
Pursuant to said Order, the Governor did file a motion with this Court seeking to realign himself as a Plaintiff and to be dismissed as a party Defendant. The motions were granted. The Governor then moved to consolidate a separate, independent action that he filed on June 7, 2001 (C. A. No. PC 01-2949 alleging the identical constitutional violation), with the original action which motion to consolidate was objected to by the Defendants. Further, in C. A. No. 01-2949, the Secretary of State filed a motion to dismiss and accompanied said motion with a memorandum in support of the motion to dismiss.
The essence of the Secretary of State's argument is that since Lincoln Almond was allowed to realign himself as a Plaintiff in the original action, and since the parties and the issues to be determined are identical, the prior pending-action doctrine compels the dismissal of C. A. No. 01-2949. A close examination of the pleadings in both cases suggest that the prayers for relief are not identical. In the newly defined action resulting from the Governor's successful motion to be realigned as a party Plaintiff in 98-2953, the Plaintiffs' pray that this Court:
 (1) Declare Executive Order 94-20 issued by Governor Sundlun on November 7, 1994 violated Article 14, Section 2 of the Rhode Island Constitution.
 (2) Declare that said violation deprived Plaintiffs of their right and continues to abridge their right as secured by Article 1, Section 1 to alter or amend the Constitution.
 (3) Prays for an injunction directing the Governor to establish a bona fide bipartisan preparatory commission to assemble information on constitutional questions for the electors.
 (4) Prays for an injunction directing the Secretary of State to submit the question to the electors at the next general election (2002).
In his Complaint PC 01-2949, the Governor requests that the Court declare:
 (1) Article 12, Section 2 of the Rhode Island Constitution was violated in 1994 when no bipartisan preparatory commission was provided for by the General Assembly or by the then Governor to assemble information on constitutional questions for the electors prior to a vote by the electors to hold a constitutional convention; and
 (2) The Governor or the General Assembly has the Constitutional obligation under Article 12, Section 2 of the Rhode Island Constitution to provide a bipartisan preparatory commission to assemble information on constitutional questions for the electors prior to the next vote by the qualified electors on the holding of a convention.
Additionally, the Governor prays this Court grant his request for declaratory judgment and provide as a remedy for the constitutional violation either that:
 (1) The Secretary of State must place the constitutional question on the ballot at the next general election in 2002; or
 (2) The Secretary of State must place the constitutional question on the ballot at the general election in 2004.
The Governor also seeks any other legal or equitable (including injunctive) relief as this Court deems necessary and proper.
 THE GOVERNOR'S STANDING
Lincoln Almond, Plaintiff, asserts that as Governor "he has a great interest and vital role, as chief executive officer of this State, in ensuring that the provisions of the Rhode Island Constitution are faithfully upheld and abided by both presently, and in the future." Yet the issue to be decided is whether there was a constitutional violation in the past! The Governor's self laudatory sentiments notwithstanding he simply has failed in his brief and in his oral argument to identify any right available to him which would deserve judicial intervention.
As stated in this Court's earlier decision, under Rhode Island law, a plaintiff must allege a personal stake in the outcome before he will have standing to assert the broader claims of the public at large. An injury shared by the public at large is insufficient; plaintiff must allege his own personal stake in the controversy that distinguishes his claim from the claims of the public at large. Burns v. Sundlun, 617 A.2d 114, 116 (1992). In 1951, the Supreme Court reaffirmed the Attorney General as the public officer vested with the authority of bringing suits for the public by stating, "[o]nly he may sue to redress a purely public wrong except in those instances where one of the public who is injured has a distinct personal legal interest different from that of the public at large, as where a public office is being withheld from the rightful incumbent thereof." McCarthy v. McAloon, 79 R.I. 55, 62, 83 A.2d 75, 78 (R.I. 1951). Since that time, however, the Court has, on rare occasions, overlooked the standing of a plaintiff seeking to adjudicate a public right where the case presented a substantial public interest, Id. (emphasis added) citing Sennott v. Hawksley, 103 R.I. 730, 731-32,241 A.2d 286, 287 (1968) (allowing taxpayer standing because of the substantial public interest raised by the case). See also, Gelch v. State Board of Elections, 482 A.2d 1204, 1207 (R.I. 1984) (the R. I. Supreme Court allowed a plaintiff to bring suit challenging the candidacy of Vincent Cianci as mayor of Providence, noting its tendency to confer standing liberally in matters involving substantial public interest).
Additionally, the intervening Attorney General contests the Governor's standing by asserting that the Governor is seeking to adjudicate a public right and, therefore, performing a function the Constitution delegated to the Attorney General. See, McCarthy, 79 R.I. at 62. In fact, the Rhode Island Supreme Court has spoken with regard to the limited nature of the executive branch:
 "The framers of Rhode Island's Constitution in 1842 and in 1986 have treated the executive power quite differently than did the framers of the federal Constitution. . . . they deliberately fragmented and distributed the executive power among four elected general officers. The Governor is designated as Chief Executive. However, the Attorney General exercises the vast powers of public prosecution, which under the federal Constitution are implemented by a presidentially appointed Attorney General. The Secretary of State exercises a significant number of executive functions, including the implementation of election statutes, the keeping of records, the oversight of the Uniform Commercial Code, and the promulgation of a myriad of reports. The General Treasurer is the custodian of the funds of the state and also performs a number of executive functions relating to investments, management of the victims' indemnity program, and a number of other duties which would be performed in the federal system by an official appointed by the President." In Re: Advisory Opinion to the Governor, 732 A.2d at 65. (emphasis added).
In his Complaint, the Governor asks this Court to declare that the Constitution was violated in 1994. The Governor, in failing to allege a harm different than that of every voter in the state as a result of his alleged violation, has no standing in this Court to seek such an adjudication. Additionally, "a case is moot when the issues presented are no longer `live' or the parties lack a legally cognizable interest in the outcome." Powell, et al. V. McCormack, 395 U.S. 486, 497, 89 S.Ct. 1944, 1951 (1969) (emphasis added). Furthermore, the Attorney General, whose duty it is to prosecute public rights, chose not to pursue it. Prosecutorial discretion is vested solely in the Attorney General, Jefferson v. State, 472 A.2d 1200 (1984), and not the Governor. It would subvert the principle of the separation of powers for this Court to intrude on the Attorney General's discretion at the direction of the Governor.
The Governor argues that because he is the Governor and that Article 14, Section 2 makes specific references to the Office of the Governor then peradventure he has the requisite standing to be heard in this case. His argument is unpersuasive. Neither he nor the Office of the Governor is being "harmed" at this point in time. The Office of the Governor will be implicated, if at all, only if the General Assembly in the future fails to establish a bipartisan preparatory commission prior to a vote by the qualified electors on the holding of a constitutional convention. The fact a violation may have occurred in the past does not require this Court to order all future office holders for all time to follow the commands of Article 14. It would be presumptuous — if not arrogant — for this Court to presume the General Assembly or the Governor, whoever he or she may be in 2004, will ignore the commands of the Constitution.
Pursuant to the remand from the Supreme Court, I find the Governor does not have the requisite standing to be heard in either PC 98-2953 or PC 01-2949, and consequently the motions of the Defendants and interveners in PC 98-2953, and the motion of the Defendant Secretary of State in PC 01-2949 to dismiss the Governor's claims are granted.
Assuming, however, that either the original Plaintiffs or the Governor did have the requisite standing to be heard in the circumstances of these two cases, let me address the merits of the salient claims and defenses presented by the pleadings and arguments:
 (1) Did Executive Order 94-20 issued by Governor Sundlun on November 7, 1994 violate Article 14, Section 2 of the Rhode Island Constitution?
Section 2 clearly required the General Assembly or the then Governor to provide a bipartisan preparatory commission to assemble information on constitutional questions for the electors prior to a vote on whether to convene a constitutional convention. The General Assembly declined to do so thus requiring the Governor to organize said commission for the intended purpose before the general election on November 8, 1994.
The Defendants argue, inter alia, that the bipartisan preparatory commission is not an indispensable prerequisite to a valid vote on a call for a constitutional convention. In support of their position, they cite Bandoni v. State 715 A.2d 580 (R.I. 1998) for the proposition that "a constitutional provision may be expressed in mandatory terms and still not be self executing." 715 A.2d 589. Unless the provision is self-executing, the legislature must provide a remedy for any violation. Otherwise, there is no judicially cognizable cause of action. Is the provision at issue self-executing? I think not. The provision at issue fails to identify who, how many and when such bipartisan commission need be organized. Bipartisan as defined in Webster's New Collegiate Dictionary is "involving members of two parties." Since this Court is being asked to interpret the meaning of certain constitutional provisions, I am struck by the realization that the very meaning of the word bipartisan is ripe with controversy. Does it mean a Republican and Democrat office holder; a registered Republican and a registered Democrat voter? What about other political parties active in Rhode Island? Are they excluded? Since the Plaintiffs rely in large measure on speculation, one might speculate as to whether a person not associated with either of the two major political parties would have standing to complain that Section 2 was unconstitutional and that any vote of the electorate, no matter how overwhelming for or against a specific proposal would be null and void because of either the inclusion or exclusion of those other than from the two major parties. How many members meet the definition of a commission? Two? Twenty? When need the commission be organized to assemble information? Six months? One month? Ten days? Clearly, it cannot be said that the provision calling for the creation of a bipartisan preparatory commission is self-executing!
Because of the finding that the provision for organizing a bipartisan preparatory commission to assemble information on constitutional questions for the electors is not self-executing, this Court is compelled to find that since the electorate did in fact have the opportunity to decide the question of whether a constitutional convention should be held and in fact 173,693 voters rejected the proposal while 118,545 approved, the lack of the bipartisan preparatory commission does not rise to the level of a violation of Article 14, Section 2 which requires action by this Court. Clearly, the commission and its recommendations is not an indispensable prerequisite to a legitimate, valid, and final vote on a call for a constitutional convention. Simply put, the voters have spoken. This Court has neither the power nor inclination to subvert the will of the voters. Courts must be reluctant to disturb the results of a bona fide election absent some compelling reason to do so.
The standards for determining what will be compelling are set out in Hoxie v. Edwards, 24 R.I. 338, 53 A. 128 (1902). * * *
 "If the statute [or constitutional provision] expressly declares any particular act to be essential to the validity of the election, or that its omission shall render the election void, all courts whose duty it is to enforce such statute, must so hold, whether the particular act in question goes to the merits, or affects the result of the election or not. Such a statute is imperative, and all considerations touching its policy or impolicy must be addressed to the legislature. But if, as in most cases, the statute simply provides that certain acts or things shall be done within a particular time, or in a particular manner, and does not declare that their performance is essential to the validity of the election, then they will be regarded as mandatory if they do, and directory if they do not, affect the actual merits of the election. Those provisions which affect the time and place of the election, and the legal qualifications of the electors are generally of the substance of the election, while those touching the recording and return or the legal vote received, and the mode and manner of conducting the mere details of the election, are directory. The principle is that irregularities which do not tend to affect the results are not to defeat the will of the majority; the will of the majority is to be respected even when irregularly expressed." Hoxie v. Edwards, supra at 345-46, 53 A at 130. D'Amico, 116 R.I. at 18-19, 351 A.2d at 104-105 (some citations omitted).
In the circumstance presented, the Governor seeks a declaration not only that a violation of the Constitution occurred, but a declaration of the rights and duties of constitutional offices. The Declaratory Judgment act requires ab initio that there be a justiciable controversy between plaintiff and defendant.
In Sullivan v. Chafee, 703 A.2d 748 (R.I. 1997), a request for legal guidance about the meaning of a charter provision was not a legitimate claim for declaratory judgment. The Supreme Court observed that the request was based on "a precise factual scenario that may never occur again — or at least not with the same parties and with the same factual underpinnings * * *." 703 A.2d at 751. "A declaratory-judgment action may not be used `for the determination of abstract questions or the rendering of advisory opinion,' Lamb v. Perry 101 R.I. 538, 542,225 A.2d 521, 523 (1967), nor does it `license litigants to fish in judicial ponds for legal advice.' Goodyear Loan Co. v. Little,107 R.I. 629, 631, 269 A.2d 542, 543 (1970)." Id. Sullivan further noted that a deficient request for declaratory judgment is to be granted only when the issues presented are "of extreme public importance, which are capable of repetition but which evade review." 703 A.2d at 752, quoting Morris v. D'Amario, 416 A.2d 137, 139 (R.I. 1980). See also Fiore v. South Kingstown, 783 A.2d 944 (R.I. Nov. 7, 2001).
The opinion in Lamb v. Perry emphasized that "the controversy must be actual and present a case for the consideration of the court wherein the plaintiff is asserting some legal or property right adverse to the defendant." 101 R.I. at 542, 225 A.2d at 523. The justiciable-controversy requirement is reiterated in case after case:
 "Any petition which is based on facts and circumstances which may or may not arise at a future date is of necessity unripe and abstract. To warrant a grant of declaratory relief, there must be a real and substantial controversy admitting of specific relief through a conclusive decree or judgment rather than through merely an advisory opinion as to what the law would be upon a hypothetical state of facts. Also, there must be some present danger to a plaintiff's rights. The Uniform Declaratory Judgments Act requires that there be a justiciable controversy between a plaintiff and a defendant and does not authorize the Superior Court to give an advisory opinion upon hypothetical facts which are not in existence or may never come into being." Berberian v. Travisono, 114 R.I. 269, 274-75, 332 A.2d 121, 124 (R.I. 1975). See also Millett v. Hoisting Engineers' Licensing Division of the Department of Labor, 119 R.I. 285, 377 A.2d 229 (R.I. 1977); Berberian v. Solomon, 122 R.I. 259, 405 A.2d 1178 (R.I. 1979).
Here there appears no ripe controversy at this time. Events have overtaken any stake which the original Plaintiffs may have had in the controversy now that the Governor is a co-plaintiff. What basically remains are the declaratory judgment actions filed by the original Plaintiffs and the Governor seeking a declaration that a violation of Article 14, Sec. 2 occurred; a prayer to direct the Secretary of State to place the question on the ballot; and, the Plaintiffs' prayer to direct the Plaintiff Governor to establish a bona fide bipartisan commission.
The Governor's constitutional duty arises only if the General Assembly fails to act after a period of ten years has passed. There was no judicial determination that the 1994 election was null and void and no indication, beyond mere speculation, that a controversy will arise in the future. If the General Assembly fails to act, and the Governor is unsure how to proceed to fulfill his or her constitutional duty, he or she could apply to this Court at that time. The Constitution gives the General Assembly the power to pose the question to the qualified electors not just every ten years, but at any election. As stated in Article 14, Sec. 2 of the Constitution, "[t]he general assembly, by a vote of a majority of the members elected to each house, may at any general election submit the question, `Shall there be a convention to amend or revise the Constitution?'" (emphasis added). Only after ten years of inaction by the General Assembly, does any duty arise for the Governor or Secretary of State.
 "If the question be not submitted to the people at some time during any period of ten years, the secretary of state shall submit it at the next general election following said period. Prior to a vote by the qualified electors on the holding of the convention, the general assembly or the governor if the general assembly fails to act, shall provide for a bipartisan preparatory commission to assembly information on constitutional questions for the electors." Id. (emphasis added).
Therefore, the General Assembly may very well in its discretion submit the question in 2002 or 2004. Only if the General Assembly fails to submit the question does the Governor's duty arise in 2004 (ten years having passed since the 1994 election when the question was submitted to the qualified electors). However, it is improper at this point in time for this Court to speculate on how the General Assembly will act or fail to act in the future and what the resulting effect will be to the Governor. It is quite possible no conflict or controversy will arise in the future. It is fundamental law that this Court should not intervene until such time that a controversy arises.
The Defendants argue that the original Plaintiffs were untimely in bringing their claim. The action was brought five years after the results were certified. The equitable doctrine of:
 "[1]aches, in legal significance, is not mere delay, but delay that works a disadvantage to another. So long as parties are in the same condition, it matters little whether one presses a right promptly or slowly, within limits allowed by law; but when, knowing his rights, he takes no steps to enforce them until the condition of the other party has, in good faith, become so changed that he cannot be restored to his former state, if the right be then enforced, delay becomes inequitable and operates as an estopped against the assertion of the right. The disadvantage may come from loss of evidence, change of title, intervention of equities and other causes, but when a court sees negligence on one side and injury therefrom on the other, it is a ground for denial of relief." Chase v. Chase, 20 R.I. 202, 203-204, 37 A. 804, 805 (R.I. 1897).
In Chase, the inequitable delay in time was a lengthy sixteen years. Here unlike Chase, the Plaintiffs were unaware of the conduct giving rise to the violation for some time after it occurred.
However, case law pertaining to elections and laches is persuasive on this point. For example, an attempt to obtain review of the State Board of Elections' determination after the election was over was found to be barred by laches. Van Daam v. DiPrete, 560 A.2d 953, 954 (1989). Undoubtedly this is due to public policy concerns. As stated by the Supreme Court:
 "[we] recognize that there is a strong public policy favoring stability and finality of election results. Courts should be reluctant to upset an election absent some compelling reason to do so. This purpose is served by the time limits set by the statute and by the limited circumstances upon which one may contest an election." Buonanno v. DiStefano et al, 430 A.2d 765, 770 (1981).
Furthermore,
 "[a] contestant may not rely upon speculation to upset an election result. A contestant is required to show that the irregularities were sufficiently large in number to establish the probability that the result would be changed by a shift of or invalidation of the questioned votes. This means that an election will not be overturned upon a mere mathematical possibility that the results could have been changed, when the possibilities all combine to repel any such conclusion." Id. at 770.
The original Plaintiffs, as well as the Governor, cannot offer evidence that the alleged violation adversely impacted the voting results with regard to the question of whether a constitutional convention should be held. Since laches in an equitable remedy, it follows that in balancing the hardships, it would be reasonable to let the results stand due to the inherent public policy considerations involved in elections, particularly since the Plaintiffs cannot prove that the result would be different if the alleged violation did not occur.
Although the Plaintiffs argue they are not challenging the results of the election on November 8, 1994, they are in fact contesting the legitimacy of having the question submitted without the establishment of the bipartisan preparatory commission. For this Court to grant any of the relief requested by any of the Plaintiffs, it would have to first find that the Constitution was violated in the manner in which the question was presented to the voters. This Court declines to do so.
The original Plaintiffs argue that the failure to establish a bipartisan preparatory commission violated their rights as secured by Article I, Section 1 to alter or amend the Constitution of Rhode Island. This argument is totally devoid of merit. There is no evidence presented that the original Plaintiffs were either disenfranchised or denied ballot access. Nor is there even a suggestion that they would have been influenced by recommendations of a commission. They were supporters of voter initiative and, as such, needed to vote for the call of a convention. The fact is that 173,693 of the 292,238 voters who cast their ballot on the issue voted not to call a constitutional convention. The allegation their rights were violated because an overwhelming majority felt otherwise is not actionable. This Court does not accept the veiled arguments of the Plaintiffs that because of the lack of a bipartisan preparatory commission those 292,238 Rhode Islanders who voted on the question at issue were uninformed, unintelligent or plainly wrong.
Finally, even if the Plaintiffs had the requisite standing, and even if this Court found a constitutional violation occurred and that the Plaintiffs were entitled to some relief, the prayer in their complaints that this Court direct Governor Almond to establish a bona fide bipartisan preparatory commission to assemble information on constitutional questions, and for this Court to order the Secretary of State to place the question on the ballot in 2002 must be dismissed.
In essence, the Plaintiffs are inviting the court to allow Governor Almond to circumvent the very provision of the Rhode Island Constitution about which he complains of Governor Sundlun. I respectfully decline said invitation. Clearly, the provision of Article 14, Section 2 assigns to the General Assembly, not the Governor, the power to first establish such a commission and directs the Governor to do so only if the General Assembly fails to act every ten years. Obviously, if the Governor felt he had constitutional permission to organize such a commission, he would have done so. It's obvious, at least he recognized the limited powers assigned the office of Governor by the voters who adopted the constitutional provisions at issue.
In summary, this Court grants the motions of the Defendants to dismiss both actions on the grounds that neither the original Plaintiffs nor the Governor have the requisite standing to bring said complaints.
Assuming the Governor, or any of the other named Plaintiffs, did have the requisite standing to be heard on their respective prayers for relief, this Court does find and declare:
 (1) Executive Order 94-20 issued on November 7, 1994 did not violate
Article 14, Section 2 of the Rhode Island Constitution.
 (2) The original Plaintiffs were not deprived of their rights secured by Article 1, Section 1 to alter or amend the Constitution.
 (3) That Section 2 of Article 14 does not assign the Governor the power, right or responsibility of establishing a bona fide bipartisan commission to assemble information on constitutional questions for the electors unless and until — at some future date — the General Assembly fails to do so for a period of ten years.
 (4) That this Court has no constitutional authority to direct the Secretary of State — at this time — to submit the question to the electors at the general election in November 2002.