CHARLES H. KNOWLES *vs.* WILLIAM H. KNOWLES.

WASHINGTON—JULY 13, 1903.

PRESENT: Stiness, C. J., Tillinghast and Douglas, JJ.

(1) *Public Lands. Highways. Dedication.*

The General Assembly in 1784 appointed a committee to lay out and plat for sale certain confiscated lands called .the Sewall farm. The report of the committee refers to· ways laid out by them, as follows: "We have also laid out a highway partly through the said farm [describing its bounds]. We have also laid a highway of eight rods wide and forty rods long, on the south side of the lot No. 3, to the fresh pond, that every lot may have free access in case of drought." The General Assembly accepted the report, and appointed a committee "to sell the said farm in lots agreeable to the said plat," and directed the general treasurer to execute deeds to the purchasers. The plat adopted by the Assembly shows and refers to "a highway to the Fresh Pond." It also states that "the land the highway contains is not included in each farm or lot."

*Held,* that by adopting the report and plat the assembly made a plain and effectual dedication of the highways.

(2) *Dedication. Acceptance.*

*Held,* further, that such dedication required no acceptance.

(3) *Dedication. Abandonment. Highways. Nonuser.*

*Held,* further, that, the highway having been established, the public right could not be abandoned except in the manner provided by law for the abandonment of highways, and no right therein could be obtained either by nonuser or adverse possession.

TRESPASS QUARE CLAUSUM. Heard, on jury trial waived, and judgment for defendant.

DOUGLAS, J. This is an action of trespass *quare clausum fregit,* for breaking and entering the plaintiff's close, known as the "Horse Lot" located on the easterly side of the "Old Point Judith Road," so called, in Narragansett (formerly South Kingstown), fronting on said highway about the width of one hundred and fifty feet, and extending about six hundred feet. This lot is on the southwest corner of the farm of the plaintiff, and is on the northerly boundary of the farm of the defendant.

The declaration charges in the usual form the breaking and entering of said close on the first day of January, A. D. 1899, and on divers days between that day and the date of the commencement of this suit, to wit:—October, A. D. 1902.

The defendant in his pleas justifies the several acts of going upon said premises mentioned in the declaration, on two distinct grounds, to wit:—First, that there is an ancient highway through and over said close, on which all the people of the State have a right to travel; and second, that he, in common with certain other persons, has a private right of way over and through said close to a pond at the easterly end thereof. The plaintiff in his replication denies that the same or any part thereof is now or ever was a highway, and also alleges that all private rights of way over and through said close in which, etc., if any ever existed, have long since been extinguished and lost by nonuser, and the absolute and exclusive adverse possession of the plaintiff and his predecessors in title for more than twenty years before the acts complained of in the plaintiff's declaration.

The plaintiff also in his replication pleads in estoppel the fact that from April 7th, 1846, until September 3rd, 1866, one Howard Knowles, grandfather of the plaintiff and father of said defendant, was the owner of and was seized and possessed in fee simple of the farm now owned by the plaintiff, including said "Horse Lot" and the farm owned by the defendant—the farm of the plaintiff being lot No. 3 and the farm of the defendant being lot No. 4 on the Sewall plat—and that the right of way, if any had existed prior to April 7th, 1846, for the benefit of lot No. 4 was extinguished by merger of the title of the dominant and servient estates in one person. When said Howard Knowles conveyed away said lot No. 3, he made no reservation of any way.

The locus upon which the trespasses are alleged to have been committed is a part of a larger tract called the Sewall farm, which was confiscated by the State in the time of the revolution and platted and sold by order of the General Assembly. The plat is printed as an exhibit in *Knowles* v. *Knowles*, 12 R. I. 400, and the report of the committee and

the action of the General Assembly approving it may be found in 10 R. I. Col. Rec. 60, 71. On the plat adopted by the General Assembly the locus is delineated as eight rods wide and forty rods long, extending easterly from the main highway to a fresh water pond; and it is also referred to in the title or certificate on the plat, which says: "This is a draft of the State Farm lying in South Kingstown at Point Judith Point containing 1163 acres and also the Dividing lines where said farm is divided into Farms or Lots, and the Quantity of land Each Farm or Lot contains and also a Draft of a highway that runs part through said Farm and *also of a highway to the Fresh Pond,* and a drift way to the Salt Marsh surveyed by order of the committee this 9th day of August, A. D. 1784.

"By ROBERT STANTON, *Surveyor."*

Appended to the above is a note, as follows:

"N. B. The land the highway contains is not included in each farm or lot."

The report of the committee, 10 Col. Rec. 60, refers to the ways laid out by them, as follows: "We have also laid out a highway partly through the said farm, beginning at the west side of the barway at the end of the stone wall, which is the line between the said farm and the Wolcott farm, thence south, 22 degrees west, 296 rods, where we fixed a stake and stones; thence south 132 rods to the northeast corner and the northwest corner of the two southermost lots, laying all the said way two rods wide on the east side of the bounds. We have also laid a highway of eight rods wide and forty rods long on the south side of the lot No. 3, to the fresh pond, that every lot may have free access in case of drought. We also have laid out a lot of about ten acres on the south side of the marsh adjoining the sea and beach, for a common, and laid out a driftway beginning at the west side of the highway at the dividing line between lots 3 and 4; thence to run across the lot No. 4 and across the corner of the lot No. 5 to the elbow corner adjoining the salt marsh, that every lot may have free access to the marsh and to the common lot:

all which will more fully appear by our plat herewith presented."

The General Assembly by vote accepted the report, and appointed a committee "to sell the said farm or tract of land in separate divisions or lots agreeable to the said plat;" and directed the general treasurer to execute deeds to the purchasers.

The report of the committee, 10 Col. Rec. 71, recited that "the committee had sold said farm agreeable to the plat," and gave an account of the sales, and this report was accepted.

It has been held that the deeds of the general treasurer are to be construed as conveying what the General Assembly, through its committee, sold, whether the description in the deed accurately described the land as platted and reported or not. In *Knowles* v. *Nichols*, 2 R. I. 198, it was held that the deed of lots 4, 5, and 6 did not convey the common lot, although it was included in the boundaries given, because the general treasurer, under the resolution, had no authority to convey it.

This finding is approved in *Knowles* v. *Knowles*, 12 R. I. 400, 407, 408, following *Knowles* v. *Nichols*, 2 Curt. 571. The two latter cases, however, disagree with *Kenyon* v. *Nichols*, 1 R. I. 411, and hold that rights to the common lot passed as appurtenant to the numbered lots on the plat, though not mentioned in the deeds.

(1)    The plat and the report are conclusive as to what passed by the deeds. Taking the words of the report and the plat, we find a plain dedication of the highways and a reservation to the State of the title to the land contained in them. It is expressly stated that the land the highway contains is not included in each farm or lot, and the report and the plat enumerate the number of acres in each lot sold, and the price paid per acre.

It is argued that the words following the declaration of the layout of the strip in question limit the effect and meaning of the word "highway." We do not think such an interpretation is consistent with the language or the circumstances.

Undoubtedly, the object of laying out ways was for the benefit, primarily, of persons who should live upon these lots, as is the case usually when land is platted into lots with streets between them; and the natural effect of the language is not to make either of these ways private, but to explain to the Assembly why a highway in one case and a driftway in the other were laid in the places selected. By accepting the language of the committee, the General Assembly dedicated the highway and approved the reason for laying it out.

(2)      That such a layout by the sovereign power which is the owner in fee of the land is effectual, cannot be questioned. The right to establish highways resides primarily in the legislature, but may be delegated to municipal or local authority.

Elliot on Roads and Streets, § 421.

In *Commonwealth* v. *McNaugher*, 131 Pa. St. 55, the court says: "Where a highway is established by the State itself, it requires no act of acceptance on the part of anyone to make it a public highway, it becomes such by act of the sovereign power by which it was established, neither its character as a highway nor the public right to use it as such can be lost by nonuser."

Acceptance by the public is necessary in the case of private dedication, 2 Greenl. Ev. 15th ed. § 662, but the legislature is the absolute judge of the necessity of a highway unless it chooses to delegate the discretion to some subordinate authority.

This conclusion brings us to the question, suggested by the defendant, whether the rights of the public in this way have become extinguished by nonuser or adverse occupation.

The evidence of use of this way is meagre. For many years a wall has been maintained across it at the main highway, in which there was a barway, or gate, from 1852 to 1899. Some of the witnesses say that they have seen people who came from the shore drive their cattle along this way from the main highway to the pond during the years from 1840 to 1852-3. The defendant's witnesses seem to establish the claim that he and his predecessors have cultivated the soil and used it for pasture and other purposes for fifty years or

more. It is conceded that no roadway was ever built there. If acceptance were necessary we could not find it conclusively upon the evidence, but neither can we find that as matter of fact it has been wholly abandoned.

(3)  This uncertainty in regard to the use of this way is of little account, as, in view of the decisions in this State, the question is a legal one. From early times the statutes have provided legal methods of discontinuing highways which should be found no longer useful.

The General Assembly has guarded very jealously its control over the highways which it has laid out. While giving large control over highways generally to town councils, it reserved to itself until 1870 the power to abandon these. The Digest of 1798 contains this provision, p. 384, § 6: "Provided that no town council shall have power to alter or change any highway which hath been or hereafter shall be laid out by the General Assembly." The same provision appears in Digest of 1822, p. 289, § 6; Digest of 1844, p. 321, § 6; Rev. Stats. 1857, cap. 43, § 26; and was first repealed by act Feb. 1870, Pub. Laws, cap. 842, a reservation being then made, and still in force, of the highways along the Woonasquatucket river. Gen. Laws, 1896, cap. 71, § 28.

This court, in accordance with the declaration of public policy implied in this legislation, and following the weight of authority, has adhered to the common-law rule, which is well stated in Wood on Nuisances, § 297, as follows: "When a highway is once established as such by the action of the proper authorities, it does not cease to be such, even though unused for many years, until it has been discontinued by the proper authorities."

In *Almy* v. *Church*, 18 R. I. 182, the evidence showed an abandonment by the public and a private possession of the ways under discussion for one hundred years or more. Yet the court held that, as they were once highways, the public right continued and the town council might open them again. The arguments advanced by the plaintiff in the case at bar and most of the cases here cited are considered by the court, the conflict of authority is recognized, and the deliberate

judgment of the court is recorded that the question whether title to the whole highway once dedicated to the public can be acquired by adverse possession, on the ground that the public have waived or abandoned the dedication, must be answered in the negative. The court sums up its conclusion, on p. 187, as follows: "The case of *Simmons* v. *Cornell*, 1 R. I. 519, held this doctrine to the extent of denying the right to gain title to a highway by encroachment; but it did not pass upon the question of an exclusive possession of the whole way. We are unable to see upon what sound principle the right can be denied in one case and not in the other.

"True, it may be said that an entire possession of the way furnished a presumption of abandonment which does not apply to a partial possession; but it may also be said that if a public right cannot be extinguished in the whole layout when enough is left unencumbered for convenient travel, the reason is stronger that the right cannot be extinguished altogether."

This decision has been approved in *Matteson* v. *Whaley*, 20 R. I. 412, and is, as we have said, in accord with the weight of authority.

"The rule best supported by reason and by weight of authority is that the 'common right of highway' cannot be lost by the attempted adverse possession of a private individual." Elliott on Roads and Streets, § 883, p. 969.

Our conclusion, therefore, must be that the highway as laid out by the committee of the General Assembly, and as shown on their plat, is still a public way, and that the alleged trespasses of the defendant are justified by his plea to that effect.

Judgment for the defendant for costs.

*Nathan B. Lewis,* for plaintiff.

*Benjamin W. Case,* for defendant.