Dennis F. O'REILLY et al.

v.

TOWN OF GLOCESTER.

No. 91–238-Appeal.

Supreme Court of Rhode Island.

March 2, 1993.

Bradford Gorham, Gorham & Gorham, Providence, John F. McDonough, North Providence, for plaintiffs.

Mildred Doar, pro se.

Salvatore Scialo, pro se.

Matthew Callaghan, Jr., North Kingston, Robert Karmen, Flanders & Medeiros, Providence, for defendant.

## OPINION

MURRAY, Justice.

The plaintiffs in this case are several landowners in the town of Glocester whose properties abut a right-of-way. The plaintiffs brought suit in Superior Court, seeking to have the court order the defendant, town of Glocester (Glocester), to locate, mark, and repair this right-of-way so that it would be safe for travel. The trial justice denied the plaintiffs' complaint, and the plaintiffs' appealed to this court.

We begin with a review of the background and history of this case. The right-of-way that is the subject of plaintiffs' lawsuit is a trail or path known as a driftway. Driftways were common forms of rights-ofway created by Rhode Island towns in the early part of this state's history and established in areas where the placement of roads would be expensive for the town and inconvenient for the abutting landowners. A 1772 enactment of the colonial General Assembly empowered towns to create driftways. It states:

"AN ACT empowering the several Town–Councils, in this Colony, to lay out Drift–Ways in their respective Towns.

*"WHEREAS it frequently happens that Ways for the passing of People and Carriages are necessary to be made through Places where the laying out Highways will be very inconvenient, and burthensome to the Proprietors of the Land, and expensive to the Towns; and the laying out Drift–Ways will answer the End:*

*"BE it therefore Enacted by this General Assembly, and, by the Authority thereof, It is Enacted,* That the several Town–Councils in this Colony be, and they are hereby, empowered to lay out Drift–Ways in their respective Towns, in such Places, and of such Width, as they shall think necessary, as fully as by Law they are empowered to lay out Highways: That such Drift–Ways be laid out in the same Manner, and be under the same Regulations, in every Respect, as Highways are: That the Damages shall be ascertained by the Town–Council, in the same Manner as in laying out Highways: That it shall be in the Power of the Town–Council to order and direct who shall be at the Charge of maintaining Gates and Bars, where any such Drift–Way or Drift–Ways shall be laid out: And that, for the future, when a Committee shall be appointed to lay out any Highway or Drift–Way, such Committee may be sworn by the Town–Council, or the Justice of the Peace appointed to attend upon them." 1772 R.I. Acts & Resolves 47–48.

This statutory provision also appears in the Public Laws of 1822 entitled "An act for laying out Highways." This 1822 enactment substituted for the words "in this Colony" the words "in this State" and thereby empowered town councils to create driftways in the newly formed State of Rhode Island. P.L. 1822, § 3 at 287.

In 1829 the Glocester Town Council created the driftway at issue in this case. The trial justice found as follows:

"On April 11, 1829 the Town Council of Glocester appointed a committee 'to lay out a drift or bridleway from the Turnpike road, west of Benjamin Dexter's by Oliver Cornwell's and William Cook[e]'s to the road that leads from the Foster line to Cyprus Burlingame's in the best place, and where it will due [*sic*] the least damage, they keeping up good gates and bars.' The committee thereupon, according to their report, 'proceeded to the southwesterly part of said Town of Glocester and therein surveyed[,] bounded[,] and marked out a drift or bridle way.' On May 8, 1829, the committee submitted its report to the council, including a description of the course of the way it marked out, and annexing an 'exact draft or plan of said driftway.' The return of their report was accepted, approved and ordered to be recorded at a council meeting on May 9, 1829."

The trial justice also found that there was a right-of-way located in the approximate location set out in this 1829 report to the town council. The course of this driftway appears in both a tax assessor's map of this area (*see* Appendix) as well as in the committee report published in the Glocester town records. There was also testimony before the trial justice concerning actual use of the driftway in the early part of this century. Mildred Lucy Doar, a plaintiff in this case, stated that she drove over the driftway in a 1936 Chevrolet automobile.

The evidence demonstrated that by 1965 the driftway had fallen into disrepair, having become overgrown by trees and brush. The bridges and culverts along the driftway are and were partially broken. The trial justice noted that many decades have passed since any automobile drove over the right-of-way. Moreover the general public had ceased to use the right-of-way. The only users of the driftway were the abutting landowners who walked and occasionally searched for blueberries along its path.

Notwithstanding this prolonged period of nonuse and government failure to maintain, this driftway is ascertainable. The trial justice wrote, "[A] modern surveyor should have no great difficulty in reconstructing the location of the original driftway. * * * The Court finds as a fact that there is a public driftway presently in exis-

tence in the Town of Glocester as laid out and surveyed in the Committee report of May 8, 1829."

Glocester does not contest the trial justice's finding that the town legally created this driftway in 1829. Glocester nevertheless refused plaintiffs' request to locate, mark, and repair the driftway. Glocester argues (1) that the town council successfully "abandoned" the driftway in 1968, (2) that even if the town council never abandoned the driftway, under current law the town has no obligation to repair the driftway, (3) that the doctrine of laches precludes plaintiffs from suing the town, and (4) that the General Assembly's enactment of G.L.1956 (1989 Reenactment) § 24–6–5, as enacted by P.L.1990, ch. 511, § 1, eliminates any remedy otherwise available to plaintiffs. We address each of these issues on this appeal.

I

THE ABANDONMENT PROCEDURES

■ The first issue we address is whether Glocester ever officially abandoned the driftway at issue in this case. The law is clear in Rhode Island that a town cannot abandon its obligation to maintain a right-of-way by simply failing to fulfill its maintenance obligations. *Wall v. Eisenstadt*, 51 R.I. 339, 345, 154 A. 651, 653 (1931); *Knowles v. Knowles*, 25 R.I. 325, 330–31, 55 A. 755, 757 (1903). General Laws 1956 (1989 Reenactment) chapter 6 of title 24 contains a number of requirements that a town must fulfill before successfully abandoning a right-of-way.

■ We start with § 24–6–2, which requires any town attempting to abandon a right-of-way to provide notice to landowners whose land abuts the right-of-way of the pendency of the abandonment proceedings. Pursuant to § 24–6–2 a town must hold a hearing so that these landowners may argue against the abandonment and present evidence concerning the damage the landowners will incur if the abandonment proceedings go forward.

■ In addition to preabandonment notice, § 24–6–1, as amended by P.L.1992,

ch. 55, § 1, and P.L.1992, ch. 298, § 1, requires a town to provide the public with postabandonment notice. This notice must come in two forms. First, the town must post a sign stating, "Not a public highway," on the right-of-way in question. Second, the town must publish notice of the abandonment for three successive weeks in a newspaper circulated in the city or town. These notice provisions help ensure that the general public will be aware that the town has terminated its obligation to maintain the right-of-way. Section 24–6–1 also provides that successful abandonment of a right-of-way causes title to the land on which the right-of-way sits to revert to the owners of the property adjacent to the right-of-way.

■ Finally, §§ 24–6–3 and 24–6–4 are damage provisions that entitle an abutting property owner to an assessment of damages once a town officially abandons its obligation to maintain a right-of-way.

■ On March 14, 1968, Samuel Cate, a plaintiff, and Hazel Aubin, a predecessor in title to some of the abutting landowners, petitioned Glocester to abandon the driftway officially pursuant to these statutory provisions. A hearing was held and the town council took the position that it would not abandon the driftway unless Samuel Cate, one of the petitioners, granted Glocester an easement to use the driftway. The minutes to a town council meeting held on July 12, 1968, state:

"It was VOTED that the petition to abandon the driftway running through the Amos W. Cooke farm and the Hazel Aubin Property be granted on the condition that Samuel Cate grant to the Town of Glocester an easement to the said Dexter Farm from Mt. Hygeia Road satisfactory to the Town Council."

The trial justice noted in his decision that there were two possible reasons why Glocester chose to attach this condition to the abandonment of the driftway. First, Glocester may have been attempting to preserve the rights of the general public to use the driftway. Second, Glocester held tax title to one of the properties that abuts

the driftway. Glocester may have been attempting to maintain the value of this property by ensuring that some right-of-way would exist so that future owners of the land would have access to the property.

Regardless of Glocester's motivations, Samuel Cate never granted Glocester an easement to use the driftway. The abandonment proceeding did not go forward. Glocester never posted notice on the driftway concerning its abandonment, nor did Glocester publish notice in a newspaper. The petitioners never collected damages as a result of this conditional abandonment.

In the lower court proceeding, Glocester argued that somehow the town could waive the condition of the easement and thereby substantially comply with the abandonment statutes. We agree with the trial justice that Glocester never abandoned the driftway.

## II

## GLOCESTER'S DUTY TO MAINTAIN THE DRIFTWAY

In addressing the second legal issue, whether Glocester has a legal duty to locate, mark, and repair this right-of-way, we once again return to the 1829 town council records concerning the driftway. The records indicate that the town council, by vote on June 6, 1829, imposed the duty to repair this driftway upon highway district No. 48. At the time, Glocester divided the town into over forty highway districts with each district repairing and maintaining its own rights-of-way.

Starting in 1896, Glocester began reducing the number of highway districts, and the town provided for the maintenance of rights-of-way on a townwide basis. In 1896 Glocester reduced the number of highway districts to four. Finally in 1900 Glocester consolidated the remaining highway districts into one district, with the town assuming the duty to maintain all rights-of-way within its borders.

The General Assembly imposed the duty to maintain rights-of-way upon towns by a statute found in the Public Laws of 1822. It is difficult to cite to the Public Laws of 1822 because the compilation is not organized by title or chapter. One will find, however, on page 286 of this compilation a section entitled "Highways." On page 290, one will find "An act for the Mending of Highways and Bridges." It states:

"That all highways, townways, causeways and bridges lying and being within the bounds of any town, shall be kept in repair and amended from time to time, so that the same may be safe and convenient for travelers with their horses, teams, carts and carriages, at all seasons of the year, at the proper charge and expence of such town, under the care and direction of the surveyor and surveyors of the highways." P.L. 1822 at 290.

This statutory provision has been controlling law in Rhode Island throughout the state's history and, with few changes, is codified today at G.L.1956 (1989 Reenactment) § 24–5–1.

■ Glocester focuses on the precise language found in the modern version of this 1822 "act for the Mending of Highways and Bridges" in arguing that the town has no duty to maintain the driftway. Glocester asserts that because § 24–5–1 expressly mentions "causeways, highways, and bridges" as falling within a town's maintenance obligations, the omission of the word "driftway" eliminates all maintenance obligations of the town with regard to this type of right-of-way.

Glocester's interpretation of "An act for the Mending of Highways and Bridges" and § 24–5–1 is without merit. In the Public Laws of 1822, three pages before "An act for the Mending of Highways and Bridges," one will find "An act for laying out Highways." P.L. 1822 at 286. As noted earlier in this opinion, this enactment empowers towns to create driftways and equates driftways with highways. It states that "such driftways, be laid out in the same manner, and be under the same regulations in every respect, as highways are." P.L. 1822, § 3 at 287. The General Assembly has never repealed this statute, and its meaning controls. Since the town has an express duty to maintain highways, and since towns are to treat driftways in

the same manner as highways, it follows that the town's maintenance duties also extend to driftways.

The practice of the town of Glocester in regard to this driftway confirms this interpretation of the statute. Glocester kept records of the town's maintenance of this driftway in 1829. These records indicate that Glocester interpreted the Public Laws of 1822 as imposing upon the town a duty to maintain the driftway.

We believe that the language found in the enactment creating driftways that equates driftways with highways and Glocester's behavior in response to this enactment indicate that Glocester has and has always had a duty to maintain this driftway.

### III

### LACHES

Thus far our opinion has been in complete accord with the decision of the trial justice. Glocester legally established a driftway in 1829, Glocester has never abandoned this driftway, and Glocester continues to have a duty to maintain and repair this driftway. We must now turn to the crux of plaintiffs' lawsuit—whether these plaintiffs have a right to compel the town to open and repair this right-of-way.

In addressing this issue, the trial justice cited our decision in *Wolfe v. City of Providence*, 77 R.I. 192, 200, 74 A.2d 843, 848 (1950), wherein we held that landowners whose property abuts a right-of-way own the fee of a public highway adjacent to their property to the middle of the way. This court went on to hold in *Wolfe* that abutting property owners have a right to sue towns to remove obstructions in a public right-of-way. *Id.* at 203, 74 A.2d at 849. Thus the trial justice recognized that precedent exists for affording plaintiffs relief. Notwithstanding this precedent, the trial justice denied plaintiffs' claim to have Glocester reopen the driftway on the ground of laches.

Laches is an equitable defense that precludes a lawsuit by a plaintiff who has negligently sat on his or her rights to the detriment of a defendant. *Fitzgerald v. O'Connell*, 120 R.I. 240, 245, 386 A.2d 1384, 1387 (1978). A court applying the defense of laches must use a two-part test. First, there must be negligence on the part of the plaintiff that leads to a delay in the prosecution of the case. *Id.* Second, this delay must prejudice the defendant. *Id.* In *Chase v. Chase*, 20 R.I. 202, 203–04, 37 A. 804, 805 (1897), this court stated:

"Laches, in legal significance, is not mere delay, but delay that works a disadvantage to another. So long as parties are in the same condition, it matters little whether one presses a right promptly or slowly, within limits allowed by law; but when, knowing his rights, he takes no steps to enforce them until the condition of the other party has, in good faith, become so changed that he cannot be restored to his former state, if the right be then enforced, delay becomes inequitable and operates as an estoppel against the assertion of the right. The disadvantage may come from loss of evidence, change of title, intervention of equities and other causes; but when a court sees negligence on one side and injury therefrom on the other, it is a ground for denial of relief."

Applying this test to the facts of this case, the trial justice concluded that laches barred plaintiffs' lawsuit. The trial justice wrote:

"This marked inertia by abutting landowners for at least a quarter century, and probably longer, plainly lulled the town government into ignoring this way entirely. Obviously, if there had been some move to open this way back in the 1940's or 1950's, when it just began to develop its impassability, the town could economically have followed the statutory route for abandonment. The compensation to the abutters might well have been significantly less than they are today or would have been, even in 1974 or 1975, when the plaintiffs first petitioned for the opening of the way. The negligence of the plaintiffs, and their predecessors in title, in failing to assert their rights is plain for this Court to see. The injury to

the Town is likewise apparent. The cause of that injury is the long-standing inaction of the abutters in asserting their rights. The application of the doctrine of estoppel by laches is inescapable."

We recognize that the application of the defense of laches is generally committed to the discretion of the trial justice. *Nickerson v. Cass*, 93 R.I. 495, 498, 177 A.2d 384, 385–86 (1962). We believe, however, that the trial justice incorrectly concluded that laches barred plaintiffs' lawsuit.

Many courts faced with the application of laches have disfavored this equitable defense in situations wherein the plaintiff's lawsuit seeks to vindicate rights of the general public. *See United States v. California*, 332 U.S. 19, 39–40, 67 S.Ct. 1658, 1668–69, 91 L.Ed. 1889, 1899 (1947); *United States v. Summerlin*, 310 U.S. 414, 416, 60 S.Ct. 1019, 1020, 84 L.Ed. 1283, 1285 (1940). These Courts have found that laches does not operate as a defense in cases of public interest for two basic reasons: (1) the importance of rights at stake when the interests of the public are asserted and (2) the determination that those rights cannot be compromised or forfeited by the negligent or illegal acts of public officials who fail to carry out their government obligations. *Student Public Interest Research Group of New Jersey v. P.D. Oil & Chemical Storage, Inc.*, 627 F.Supp. 1074, 1085 (D.N.J.1986).

This reluctance of courts to apply laches in cases of public interest arises in two contexts. First, the doctrine of laches generally does not apply when the government sues a private party to assert a public right. The Federal District Court in Rhode Island addressed such a case in *Violet v. Picillo*, 648 F.Supp. 1283, 1295 n. 10 (D.R.I. 1986). In *Violet* the Attorney General of Rhode Island sued a generator of hazardous waste under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601(32), 9607. *Violet*, 648 F.Supp. at 1285. The court held that the defendant could not assert the defense of laches against the government when the govern-

ment seeks to protect a public interest. *Id.* at 1295 n. 10.

A second context wherein this concern for the public interest arises is where a private individual, as opposed to the government, asserts rights of public importance. *See Lake Michigan Federation v. United States Army Corps of Engineers*, 742 F.Supp. 441, 446–47 (N.D. Ill.1990) (holding that laches does not bar a suit by a private plaintiff seeking to ensure that the government acts in accordance with the public interest); *Connecticut Fund For the Environment, Inc. v. Upjohn Co.*, 660 F.Supp. 1397, 1413–14 (D.Conn.1987). In both these contexts, courts have taken the position that when public rights are at stake, courts should disfavor the defense of laches.

Although this court has not addressed the importance of public rights in the context of laches, this court has employed analogous reasoning in the context of adverse possession. In a number of cases we held that the public cannot lose its right to use public land on the basis of an adverse-possession claim by a private party. *Wall*, 51 R.I. at 345, 154 A. at 653; *Knowles*, 25 R.I. at 330–31, 55 A. at 757. *See also Hall v. Nascimento*, 594 A.2d 874, 877 (R.I.1991) (holding that all state-owned land is held in "trust" by the government for the benefit of the public and cannot be extinguished by a private right of action based on adverse possession). As in the context of laches, these precedents rest on the belief that the public right to use government property cannot be forfeited by the nonuse on the part of the public or the failure of the government to maintain the property.

This reasoning applies with equal force to the facts of this case. Chapter 6 of title 24 of the General Laws establishes the procedures a town must follow when seeking to remove rights-of-way from the public domain. These procedures are exclusive. The public could not lose the right to use this driftway on the basis of an adverse-possession claim by the abutting landowners. *Wall*, 51 R.I. at 345, 154 A. at 653.

Moreover, the public cannot forfeit its right to use the right-of-way on the basis of the equitable defense of laches. The public interest in this case precludes the use of this defense.

In concluding that equity required the barring of plaintiffs' claims, the trial justice found that the application of laches was especially apt because the public interest in having the town open the driftway was minimal. The trial justice stated that there is "no evidence of any deprivation of any *public* right to travel" since an alternative route runs parallel to the driftway along Mt. Hygeia Road.

We disagree that there has been no injury to the public. The evidence clearly established that the driftway was in a complete state of disrepair. How is the public expected to use a right-of-way that is not fit for travel? Indeed, it is likely that any lack of public interest in this right-of-way is a direct consequence of Glocester's failure to maintain it. Moreover, if the town were to conclude that there is little public interest in the use of this driftway, the appropriate method for removing this right-of-way from the public domain is to follow the statutory abandonment procedures. Glocester cannot extinguish its obligation to maintain this driftway, or in the alternative, to provide abutting landowners with damages, by failing to fulfill its maintenance obligations for a prolonged period of time.

We also do not believe that a straightforward application of the laches defense, ignoring the public interest in this case, leads to a different result. In order for laches to apply, plaintiffs must have failed to do something that equity would require them to do. *See, e.g., United States v. Olin Corp.,* 606 F.Supp. 1301, 1309 (N.D.Ala. 1985). The obligation of towns to maintain rights-of-way, however, does not derive from a requirement that citizens complain when the government fails to fulfill its maintenance obligations. The obligation to maintain rights-of-way is a legal obligation imposed upon towns by the General Assembly. *See* § 24–5–1 and its legislative history. Although plaintiffs may have been negligent in failing to assert their rights sooner, Glocester was equally negligent in failing to fulfill its statutory obligation to maintain the right-of-way. Any prejudice Glocester will suffer by repairing this driftway is prejudice occasioned by its own failure to act. Accordingly we conclude that laches does not operate as a defense to plaintiffs' lawsuit.

IV

THE CONSTITUTIONALITY
OF § 24–6–5

Our resolution of the laches issue does not end our review of this case. On July 13, 1990, less than two months after the trial justice issued his decision and less than one month after plaintiffs filed a notice of appeal to this court, the General Assembly enacted § 24–6–5. It states:

"SECTION 1. CHAPTER 24–6 OF THE GENERAL LAWS ENTITLED 'ABANDONMENT BY TOWNS' IS HEREBY AMENDED BY ADDING THERETO THE FOLLOWING SECTION:

"*24–6–5. Abandonment by nonuse.*—Notwithstanding the foregoing provisions of this chapter, when a public way of any kind in the town of Glocester has ceased to be used by the public and maintained by the town of Glocester for a period of twenty (20) years or more it shall be deemed abandoned and the abutting landowners shall not be entitled to recover damages against the city or town. Upon such abandonment the abutting landowners shall have a private right of access to their land along the abandoned way.

"SECTION 2. This act shall take effect upon passage and shall apply retroactively to July 1, 1970." P.L.1990, ch. 511, §§ 1, 2.

This statute is controlling law in this case even though the statute was not in effect at the time of trial and the trial justice never addressed it in his decision. Under Rhode Island law if the General Assembly changes the law while a case is pending appeal, the law in effect at the

time of the appeal controls the case. *See Rekowski v. Cucca*, 542 A.2d 664, 666 (R.I. 1988).

The more difficult question is whether we can constitutionally apply the retroactivity provision found in § 24–6–5. At the outset, we comment on two remarkable characteristics of this legislation. First, § 24–6–5 affords to Glocester residents fewer rights than those held by property owners in other towns in Rhode Island. The General Assembly has given the town councils in every other town two options with regard to the town's regulation of roads and other rights-of-way. A town can choose to repair and maintain the right-of-way pursuant to its statutory obligation. *See* § 24–5–1. In the alternative, if the town does not want to continue to maintain the right-of-way, and the public has ceased to use the right-of-way, the town can follow the abandonment procedures set forth in chapter 6 of title 24. Should the town choose to follow the abandonment procedures, however, the town must pay damages to abutting landowners as a consequence of this removal of the right-of-way from the public domain. *See* §§ 24–6–3 and 24–6–4.

Glocester, according to § 24–6–5, does not face this dilemma. Glocester can choose not to maintain the right-of-way. In addition Glocester can avoid the abandonment procedures, including its obligation to pay damages to the abutting property owners. According to § 24–6–5, after Glocester has failed to maintain a right-of-way for twenty consecutive years, Glocester owes no duty to compensate its residents following the abandonment of a public way.

The second remarkable characteristic of the legislation is its retroactivity provision. Section 2 of this act makes § 24–6–5 retroactive to July 1, 1970. To understand the effect of this retroactivity provision, it is helpful to contrast the prospective application of this legislation with its retroactive application. Prospectively, the twenty-year abandonment period provided by § 24–6–5 would begin to run on July 13, 1990, the date the statute became law. Abutting property owners in Glocester would be on notice that after twenty years of nonuse by the public, the right-of-way adjacent to their land would no longer be maintained by the town and they would no longer be entitled to damages following its removal. Abutting landowners in Glocester would then be aware of the impending devaluation of their property that would result from this removal of the road, turnpike, or driftway.

Retroactively, § 24–6–5 has a much more onerous effect. Section 24–6–5 became law on July 13, 1990. Yet the statute is retroactive to July 1, 1970, and hence the twenty-year abandonment period begins to run from that date. For these plaintiffs who for close to twenty-five years have asserted their right to live adjacent to a maintained right-of-way, § 24–6–5 extinguishes their right to maintenance and repair without any advance notice. Section 24–6–5 devalues these people's properties and never affords them an opportunity, in advance, to sell their property or make alternative arrangements for its use consistent with the town's removal of the right-of-way.

We agree with plaintiffs that this court cannot apply § 24–6–5 retroactively without violating the due process clause of the Fourteenth Amendment to the United States Constitution. This court, following United States Supreme Court precedents, has stated that retroactive legislation, like prospective legislation, must meet the test of due process. *Brennan v. Kirby*, 529 A.2d 633, 639 (R.I.1987). *See Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16–17, 96 S.Ct. 2882, 2893, 49 L.Ed.2d 752, 767 (1976). In deciding whether due process has been met, this court must uphold the legislation if a rational legislative purpose justifies the retroactive application of the statute. *Brennan*, 529 A.2d at 640 (citing *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 731, 104 S.Ct. 2709, 2719, 81 L.Ed.2d 601, 612 (1984)).

In the past, when examining the validity of retroactive legislation, we have applied a balancing test to determine whether the retroactive application of the statute is rationally based. In *Lawrence v. Anheuser-*

*Busch, Inc.*, 523 A.2d 864 (R.I.1987), we quoted with approval the approach suggested by Professor Charles B. Hochman in *The Supreme Court and the Constitutionality of Retroactive Legislation*, 73 Harv. L.Rev. 692 (1960). Professor Hochman wrote,

> "[F]rom an analysis of the cases it becomes apparent that it is impossible to reduce the potentially infinite variety of situations in which the problem of retroactivity can arise to a single common denominator. However, it is just as clear that the factor most often appearing in these cases is the extent to which the parties have laid reasonable reliance on the law existing at the time of the conduct whose legal consequences the retroactive statute would alter. The importance of this element is apparent when one considers that in very general terms the two major factors to be weighed in determining the validity of a retroactive statute are the strength of the public interest it serves and the unfairness created by its retroactive operation, and the reliance of the parties on preexisting law is perhaps the most accurate gauge of the latter." *Lawrence*, 523 A.2d at 870.

Professor Hochman's test simply balances the public interest in the retroactive application of the statute with the reliance interest of the parties on the preexisting law.

The United States Supreme Court decision in *Usery*, 428 U.S. at 17, 96 S.Ct. at 2893, 49 L.Ed.2d at 767, also inquired into a party's reliance on preexisting law. In *Usery*, the Supreme Court examined the retroactive portions of the Federal Coal Mine Health and Safety Act, as amended by the Black Lung Benefits Act of 1972, which required coal mine operators to compensate workers suffering from pneumoconiosis, a lung disease, which inflicted the worker before the enactment of the statute. *Id.* at 16–17, 96 S.Ct. at 2892–93, 49 L.Ed.2d at 766–67. The Supreme Court wrote:

> "the justification for the retrospective imposition of liability must take into account the possibilities that the Operators may not have known of the danger of their employees' contracting pneumoconi-

osis, and that even if they did know of the danger their conduct may have been taken in reliance upon the current state of the law, which imposed no liability on them for disabling pneumoconiosis." *Id.* at 17, 96 S.Ct. at 2893, 49 L. Ed.2d at 767.

A more recent United States Supreme Court case dealing with retroactive legislation, *Pension Guaranty Benefit Corp.*, 467 U.S. at 730, 104 S.Ct. at 2718, 81 L.Ed.2d at 611, did not employ this balancing test, nor did the Court inquire into the reliance interests of the parties. The Supreme Court held that retroactive legislation meets the test for due process if it is supported by a rational legislative purpose. *Id.* In making this determination, a court may inquire into whether retroactive application of the statute leads to a "particularly harsh and oppressive result." *Id.* at 733, 104 S.Ct. at 2720, 81 L.Ed.2d at 613–14.

We believe that under either formulation of the test for retroactivity, the retroactive application of § 24–6–5 violates due process. The first step is to examine the public purpose justifying the retroactive application of the statute. Glocester maintains that "[r]ural towns like Glocester are replete with ancient roads and driftways that long ago have fallen into disuse." Glocester asserts that if all the abutting landowners sued to have these roads opened, the result would be financial calamity for the state.

Even a cursory review of this legislation reveals that this statute is not rationally related to this stated public purpose. In the present case these plaintiffs will likely be the only plaintiffs burdened by the retroactive application of this statute. On its face this statute only applies to the small town of Glocester, and within that small town, only to plaintiffs whose property abuts a right-of-way that the town has failed to maintain. Moreover, by making this legislation retroactive for twenty years, the statute cuts off the rights of these plaintiffs who have been trying to have the town open this driftway. We believe that the General Assembly enacted this legislation not with the intention of forwarding the broad public purpose of

shielding itself from damage claims on a statewide basis but for the singular purpose of eliminating the rights of these plaintiffs to live adjacent to a maintained right-of-way—or in the alternative, to an award of damages. We do not believe this is a rational legislative purpose.

Under the approach employed in *Pension Guaranty Benefit Corp.*, this conclusion is sufficient to find the retroactivity provision of this statute unconstitutional. Yet our conclusion finds even more support from the fact that application of the retroactivity portion of this statute would lead to a "harsh and oppressive result." 467 U.S. at 733, 104 S.Ct. at 2720, 81 L.Ed.2d at 613–14. In 1968 Samuel Cate, a plaintiff in this case, and Hazel Aubin, a predecessor in title to many of the parties in this case, had an opportunity to take part in the official abandonment of this driftway and obtain damages. They chose not to agree to the abandonment because Glocester wanted an easement to use the driftway, and instead plaintiffs sought to have Glocester fulfill its statutory obligation to maintain the right-of-way.

Section 24–6–5 retroactively eliminates both these avenues for redress. In 1990, after close to twenty-five years of trying to have Glocester open this driftway, plaintiffs learn not only that they are not entitled to have Glocester maintain the right-of-way, but also that they are not entitled to damages. Clearly, Samuel Cate and Hazel Aubin would have accepted the offer to abandon the driftway in 1968 and obtained the damages available if they knew that their failure to accept Glocester's offer would result in the General Assembly's extinguishing their rights to maintenance or damages with regard to the driftway. We believe that plaintiffs did rely on preexisting law and that the retroactivity portion of § 24–6–5 unfairly prejudices them in violation of due process.

## V

## VIOLATION OF FEDERALLY PROTECTED RIGHTS

■ A vague allusion is made in plaintiffs' brief that the town's failure to repair the driftway may have deprived them of federally protected rights, including the right to due process. Rule 16(a) of the Supreme Court Rules of Appellate Procedure provides that issues that are not briefed or argued will be deemed to be waived. We are of the opinion that plaintiffs have not adequately briefed or argued the issue of federally protected rights in this case. Consequently this issue is deemed to have been waived, and we shall not address it.

## VI

## THE REMEDY

■ Having found that Glocester owes plaintiffs a duty to maintain this driftway and that § 24–6–5 does not eliminate their right to relief, we now must address the appropriate remedy. As noted throughout this opinion, in many respects this driftway resembles a road or highway. The Glocester Town Council established it in the same manner as a road or highway. In addition, the 1822 "act for laying out Highways" indicates that driftways are to be regulated in the same manner as roads.

This language does not mean, however, that driftways are roads in each and every respect. As the original 1772 enactment of the colonial General Assembly makes clear, towns established driftways in areas where roads would be expensive. This enactment states that *"[w]hereas it frequently happens that Ways for the passing of People and Carriages are necessary to be made through places where the laying out Highways will be very inconvenient * * * Drift-Ways will answer the End."* 1772 R.I. Acts & Resolves 47.

Pursuant to this language, the duty that Glocester owes toward driftways is different from the duty the town owes toward highways or turnpikes. David Dumas, a historian and title expert, testified at trial that the duty a town owed to a driftway was most likely the duty to keep it open. We agree, and accordingly we order the town of Glocester to locate, mark, and repair this driftway so that it is passable and available for use by "People" and "Carriag-

es."[1] We note that this order does not foreclose Glocester's ability to follow the abandonment procedures. In the event Glocester chooses to abandon the driftway, the town must provide the plaintiffs with damages.

For these reasons, the plaintiffs' appeal is sustained, and the judgment of the Superior Court is reversed. The papers in this case may be remanded to the Superior Court for entry of judgment in accordance with this opinion.

1. We exempt this order from the regulations of the Department of Environmental Management to avoid any conflict that this order may have with already existing agency rules and procedures.