Robert S. **VINEBERG**, Michael D. Vineberg, and Sydney Feldhammer, As Trustees of the Dr. and Mrs. Stern Foundation, Plaintiffs, Appellees,

v.

Maria–Louise **BISSONNETTE**, Defendant, Appellant.

No. 08–1136.

United States Court of Appeals, First Circuit.

Heard Oct. 8, 2008.

Decided Nov. 19, 2008.

David A. Levy, for appellant.

Thomas R. Kline, with whom Andrews Kurth LLP was on brief, for appellees.

Before LYNCH, Chief Judge, SELYA and LIPEZ, Circuit Judges.

SELYA, Circuit Judge.

This case has its roots in one of history's bleakest periods: the Holocaust. It began with the de facto confiscation of a valuable

work of art by the Third Reich, which eventually led to the litigation that confronts us today.

In its present form, the case presents a narrow legal question concerning the viability of a laches defense asserted by the current possessor of the work of art in an effort to fend off an action for replevin. After the close of discovery, the district court granted summary judgment in favor of the original owner's successors in interest. *See Vineberg v. Bissonnette*, 529 F.Supp.2d 300 (D.R.I.2007). We affirm.

## I. BACKGROUND

The abecedarian facts are not seriously disputed. In 1934, Dr. Max Stern inherited an art gallery located in Düsseldorf, Germany. Dr. Stern, who was of Jewish ancestry, quickly became an object of Nazi persecution. The Reich Chamber for the Fine Arts, an organ of the Nazi government, determined that Dr. Stern lacked the requisite personal qualities to be a suitable exponent of German culture. For that reason, it directed Dr. Stern to liquidate the gallery and its inventory.

After unsuccessfully appealing this edict, Dr. Stern surrendered to the inevitable. He consigned most of the affected works of art to the Lempertz Auction House (LAH), a government-approved purveyor. The consignment included a painting by Franz Xaver Winterhalter known as "Mädchen aus den Sabiner Bergen" (the Painting). In November of 1937, LAH auctioned the consigned pieces (including the Painting) at prices well below their fair market value.

Fearing for his life, Dr. Stern fled Germany shortly after the forced sale. He eventually settled in Canada. The Nazi government prevented him from retrieving the auction proceeds.

During World War II, many of LAH's records were destroyed by bombing. That circumstance hampered post-war searches to identify and locate the purchasers of Dr. Stern's collection. Nevertheless, Dr. Stern made various efforts to find the works of art that had been wrested from him.

In the immediate aftermath of World War II, Dr. Stern recovered some of his paintings through the Canadian Military Mission. He also filed a restitutionary claim with the military government in the British zone of occupied Germany.

Having achieved only limited success, Dr. Stern placed advertisements in *Canadian Art* and *Die Weltkunst* in 1948 and 1952, respectively. In addition, he visited Europe in 1949 to hunt for his missing artworks.

In 1958, Dr. Stern initiated judicial proceedings in Germany regarding paintings seized by the Nazi government. Among other things, he later pursued claims for monetary compensation in the German restitution courts. In 1964, a German court awarded Dr. Stern damages for profits lost due to the forced sale of his art collection.[1]

When Dr. Stern died in 1987, he bequeathed the residue of his estate, including any interest in the Painting, to what the parties have called the Stern Estate. In April of 2004, the Stern Estate contracted the Art Loss Register (the Register), an art recovery company and databank, to assist in the search for the missing works of art. For good measure, the estate also listed the Painting on Germany's Lost Art Internet Database.

---

1. The defendant has not argued either claim preclusion or offset based on the German decree. Therefore, we do not probe the point more deeply.

As matters turned out—none of this was known to Dr. Stern or his successors in interest until the end of 2004—the Painting had been purchased from LAH in 1937 by Dr. Karl Wilharm. For more than six decades, it remained sequestered in the private collection of Dr. Wilharm and his descendants, with the exception of a single brief exhibition in Kassel, Germany in the early 1950s. Defendant-appellant Baroness Maria–Louise Bissonnette, Dr. Wilharm's step-daughter, took possession of the Painting in 1959 and formally inherited it as part of her mother's estate in 1991.

The defendant has resided in the United States since 1956. She brought the Painting with her when she moved to Rhode Island in 1991. In April of 2003, she consigned the Painting to Estates Unlimited, a Rhode Island auction house. After verifying the Painting's authenticity, Estates Unlimited scheduled an auction for January 6, 2005. Promotional activities began.

Shortly before the appointed auction date, the Register informed the Stern Estate about what was transpiring. It simultaneously notified Estates Unlimited of the Stern Estate's claimed interest in the Painting. As a prudential measure, Estates Unlimited withdrew the Painting from the scheduled auction.

In January of 2005, the Stern Estate filed a claim for the Painting with the New York Holocaust Claims Processing Office (HCPO). HCPO demanded that the defendant return the Painting. Although the defendant refused to honor that demand, negotiations ensued. When the talks failed, the defendant shipped the Painting to Germany and instituted an action in a German court to determine ownership. That led to the institution of the instant action in Rhode Island's federal district

court. The named plaintiffs are Robert S. Vineberg, Michael D. Vineberg, and Sydney Feldhammer, in their capacities as trustees of the Dr. and Mrs. Stern Foundation.[2] They sought to replevy the Painting or, in the alternative, to recover damages.

Following a period of discovery, the trustees moved for summary judgment. In a comprehensive rescript, the district court granted the motion and ordered replevin. *See Vineberg*, 529 F.Supp.2d at 311. In so holding, the court rejected a proffered laches defense, concluding (i) that Dr. Stern and the Stern Estate had exercised reasonable diligence in searching for the Painting and (ii) that in all events, the defendant had not been prejudiced by any delay in the filing of suit. *Id.* at 310–11. This timely appeal followed.

## II. DISCUSSION

On appeal, the defendant raises two claims of error. First, she argues that the court below abused its discretion in refusing to reopen discovery after she retained new counsel. Second, she argues that the court erred in summarily rejecting her laches defense. We address these claims of error separately.

### A. *The Discovery Ruling.*

Federal trial courts enjoy broad discretion in managing the pace of pretrial proceedings, including the timing of discovery. *Dynamic Image Techs., Inc. v. United States*, 221 F.3d 34, 38 (1st Cir. 2000); *see Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 186 (1st Cir.1989) (indicating that court of appeals will intervene in discovery management only "where the lower court's discovery order was plainly

2. The named plaintiffs are also executors of Dr. Stern's last will and testament. In his will, Dr. Stern bequeathed the residue of his estate, including any interest in the Painting, to the Foundation.

wrong and resulted in substantial prejudice to the aggrieved party"). Accordingly, we review a district court's refusal to reopen discovery for abuse of discretion. *United States v. Sayer*, 450 F.3d 82, 90 (1st Cir.2006). We turn, then, to whether the district court had sufficient reason to reject the defendant's request to reopen discovery.

■ To begin, the record reveals with conspicuous clarity that the court gave the parties an ample opportunity to conduct discovery. In its initial scheduling order, the court allowed approximately seven months for this purpose. On three subsequent occasions—twice on joint motions and once on the defendant's unilateral motion—the court granted one-month extensions.

■ In the absence of extenuating circumstances—and none are evident here—a period of ten months for pretrial discovery in a one-on-one case involving relatively straightforward issues seems adequate. Trial courts have a responsibility to manage their dockets efficiently, and a necessary corollary of that proposition is that litigants are entitled to a reasonable period of time within which to conduct discovery, not a limitless period. *See, e.g., Rivera-Torres v. Rey–Hernández*, 502 F.3d 7, 11–12 (1st Cir.2007); *Coyante v. P.R. Ports Auth.*, 105 F.3d 17, 23 (1st Cir.1997).

Here, moreover, the defendant failed to offer any persuasive explanation for her failure to complete discovery within the previously established time frame. The only reason cited by the defendant in her motion papers was her retention of successor counsel. The engagement of a new attorney, without more, does not compel—or even necessarily favor—the reopening of a previously closed period of discovery. *See, e.g., Hussain v. Nicholson*, 435 F.3d 359, 363–64 (D.C.Cir.2006).

In the same vein, the defendant has failed to point to any relevant leads that she might have obtained had the district court reopened discovery. This may be an important factor in deciding whether to reopen discovery. *See Sayer*, 450 F.3d at 90; *Panatronic USA v. AT & T Corp.*, 287 F.3d 840, 846 (9th Cir.2002). By like token, it may be an important factor in gauging the district court's exercise of its discretion.

To cinch matters, the defendant's proposed discovery extension threatened to delay the proceedings. At the time the defendant moved to reopen, discovery had been closed for over five weeks, the plaintiffs' motion for summary judgment had been pending for nearly three weeks, and the defendant's response thereto was overdue. Taken in the ensemble, these circumstances counsel in favor of upholding the district court's ruling. *See, e.g., Hussain*, 435 F.3d at 363–64 (affirming district court's denial of request to reopen discovery filed three weeks after opponent's motion for summary judgment).

To say more on this point would be supererogatory. Under these circumstances, we hold without serious question that the lower court did not abuse its discretion in refusing to reopen discovery. *See, e.g., Sayer*, 450 F.3d at 89–90; *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 661 (7th Cir.2001).

### B. *The Summary Judgment Ruling.*

■ We review a grant of summary judgment de novo, applying the same criteria as the trial court. *See Cox v. Hainey*, 391 F.3d 25, 28–29 (1st Cir.2004). We will affirm only if the record reveals "no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

For this purpose, an issue is "genuine" if it "may reasonably be resolved in favor of either party." *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir.1990) (internal quotation marks omitted). A fact is "material" only if it "possess[es] 'the capacity to sway the outcome of the litigation under the applicable law.' " *Cadle Co. v. Hayes*, 116 F.3d 957, 960 (1st Cir.1997) (quoting *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.1995)). In prospecting for genuine issues of material fact, we resolve all conflicts and draw all reasonable inferences in the nonmovant's favor. *See Calvi v. Knox County*, 470 F.3d 422, 426 (1st Cir.2006); *Garside*, 895 F.2d at 48.

Although this perspective is favorable to the nonmovant (here, the defendant), she still must demonstrate, "through submissions of evidentiary quality, that a trialworthy issue persists." *Iverson v. City of Boston*, 452 F.3d 94, 98 (1st Cir. 2006). Moreover, "[o]n issues where the nonmovant bears the ultimate burden of proof, [she] must present definite, competent evidence to rebut the motion." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir.1991). These showings may not rest upon "conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990).

The lower court discerned no genuine controversy about the plaintiffs' ownership of the Painting. *See Vineberg*, 529 F.Supp.2d at 307–08. The defendant did not contest the question of ownership below, nor does she challenge the district court's assessment on appeal. On that basis, the court determined that the plaintiffs had proved the essential elements of their replevin claim. *Id.* at 311.

To blunt the force of this determination, the defendant relied below on an affirmative defense: laches. The district court ruled this defense deficient as a matter of law. *Id.* The instant appeal takes aim at that ruling.

We start this aspect of our analysis with a few words about choice of law. The district court applied Rhode Island law to the replevin claim on the ground that the defendant had waived any argument in favor of applying German law. *See id.* at 305 & n. 9. On appeal, the defendant does not challenge this choice-of-law determination. Consequently, we look to the substantive law of Rhode Island for the rules of decision with respect to the existence of laches. *See Lackawanna Chapter of Ry. & Loco. Hist'l Soc'y, Inc. v. St. Louis County*, 497 F.3d 832, 835 (8th Cir.2007); *see also CPC Int'l, Inc. v. Northbrook Excess & Surplus Ins. Co.*, 962 F.2d 77, 99 (1st Cir.1992).

Laches is an affirmative defense. *See* Fed.R.Civ.P. 8(c). Under Rhode Island law, it is also an equitable defense.[3] The defense has two elements; that is, it "involves not only delay but also a party's detrimental reliance on the status quo." *Adam v. Adam*, 624 A.2d 1093, 1096 (R.I.1993). Thus, a successful showing of laches requires proof both that the plaintiff delayed prosecution of the claim and that the resulting delay prejudiced the defendant's substantial rights. *O'Reilly v. Town of Glocester*, 621 A.2d 697, 702 (R.I. 1993).

---

**3.** Although laches historically had force under Rhode Island law only in equitable proceedings, *see, e.g., Jonklaas v. Silverman*, 117 R.I. 691, 370 A.2d 1277, 1280 (1977), the district court assumed, without deciding, that it could be invoked in a replevin action, *Vineberg*, 529 F.Supp.2d at 308 n. 16. As the parties have not raised this issue on appeal, we indulge the same assumption.

Proof of these elements necessarily requires a fact-sensitive inquiry into the particular circumstances of the case at hand. *See Raso v. Wall,* 884 A.2d 391, 396 (R.I.2005). For that reason, a laches defense is normally not susceptible to pretrial resolution. Nevertheless, when the record is sufficiently clear, even elusive concepts like delay and prejudice may be evaluated conclusively on a pretrial motion. Thus, in an appropriate case a court may summarily dispose of a laches defense. *See, e.g., Grissom v. Pawtucket Trust Co.,* 559 A.2d 1065, 1067 (R.I.1989); *Greek Orthodox Patriarchate v. Christie's, Inc.,* 98 Civ. 7664, 1999 WL 673347, at *9–10 (S.D.N.Y. Aug.30, 1999); *cf. Kunstsammlungen Zu Weimar v. Elicofon,* 536 F.Supp. 829, 849–52 (E.D.N.Y.1981) (concluding on motion for summary judgment that plaintiff had not unreasonably delayed pursuit of claims for paintings stolen during World War II and, thus, his claims were not barred by statute of limitations), *aff'd,* 678 F.2d 1150, 1165 (2d Cir.1982).

Here, the court below found the laches defense to be doubly deficient. First, the court held that Dr. Stern and his successors in interest had pursued their claim to the Painting diligently. *Vineberg,* 529 F.Supp.2d at 310. Second, the court held that the defendant had failed to adduce any probative evidence of prejudice. *Id.* at 311. The defendant protests both holdings.

We deal first with the matter of prejudice. Concluding, as we do, that the district court did not err in finding a dearth of evidence anent prejudice, we do not reach the issue of undue delay (and, thus, take no view as to the degree of diligence exercised by the plaintiffs and their predecessors in interest).

Typically, the kind of prejudice that will support a laches defense arises out of a loss of evidence, the unavailability of important witnesses, the conveyance of the property in dispute for fair market value to a bona fide purchaser, or the expenditure of resources in reliance upon the status quo ante. *See Fitzgerald v. O'Connell,* 120 R.I. 240, 386 A.2d 1384, 1388 (1978); *see also Robins Island Pres. Fund, Inc. v. Southold Dev. Corp.,* 959 F.2d 409, 424 (2d Cir.1992). Looked at more globally, prejudice in this context is normally either evidence-based or expectations-based. *See Danjaq LLC v. Sony Corp.,* 263 F.3d 942, 955 (9th Cir.2001).

In this venue, the defendant suggests, without the slightest elaboration, that potential witnesses and evidence are likely unavailable at this late date. Appellant's Br. at 18. This suggestion is deeply flawed.

For one thing, the court of appeals is not a place in which a party should be allowed to pull a rabbit out of a hat. New arguments are not ordinarily permitted on appeal. *See, e.g., Clauson v. Smith,* 823 F.2d 660, 666 (1st Cir.1987). That maxim applies in this instance because the defendant wholly failed to raise the possibility of evidence-based prejudice in the district court.[4] Accordingly, we may not consider the possibility now. *Teamsters, Chauffeurs, Warehousemen & Helpers Union v. Superline Transp. Co.,* 953 F.2d 17, 21 (1st Cir.1992) ("If any principle is settled in this circuit, it is that, absent the most extraordinary circumstances, legal theories not raised squarely in the lower

---

4. The defendant did allude to the difficulty of locating documentary evidence in her objection to a motion to compel discovery, but she did not relate that supposed difficulty in any way to her laches defense. By the same token, she did not refer to it in her opposition to the motion for summary judgment.

court cannot be broached for the first time on appeal.").

Even were we to consider this evidence-based contention, it would not serve the defendant's ends. In making this belated reference, she fails to point to any particular witnesses (or types of witnesses) whom she might have consulted or to any particular documents (or types of documents) that she might have located but for the delayed commencement of the action. She has not even adumbrated the nature of the witnesses or evidence that might have been marshaled if not for the passage of time. Proving prejudice requires more than the frenzied brandishing of a cardboard sword; it requires at least a hint of what witnesses or evidence a timeous investigation might have yielded. *See, e.g., adidas–Am., Inc. v. Payless Shoesource, Inc.,* 546 F.Supp.2d 1029, 1072 (D.Or.2008) (rejecting laches defense at summary judgment stage on ground that defendant had failed to identify any specific missing evidence or witnesses); *EEOC v. Phillips Colls., Inc.,* 984 F.Supp. 1464, 1470 (M.D.Fla.1997) (similar).

If more were needed—and we doubt that it is—there is a structural defect in the defendant's belated assertion of evidence-based prejudice: she has not explained how the acquisition of further testimony or documents might assist her defense. Where courts have allowed a laches defense to be premised on an evidence-based predicate, they have done so because that evidence would have been relevant to one or more essential issues in dispute between the parties. *See, e.g., In re Peters,* 34 A.D.3d 29, 821 N.Y.S.2d 61, 69 (N.Y.App.Div.2006) (title); *Wertheimer v. Cirker's Hayes Storage Warehouse, Inc.,* 300 A.D.2d 117, 752 N.Y.S.2d 295, 297 (N.Y.App.Div.2002) (same); *Greek Orthodox Patriarchate,* 1999 WL 673347, at *10 (same). Here, however, the defendant has chosen not to contest ownership of the Painting. Given that choice and the defendant's failure to identify any other controverted issue to which difficult-to-locate witnesses or evidence might be pertinent, she cannot make a credible showing of evidence-based prejudice.

In the court below, the defendant advanced two additional grounds for a prejudice finding: (i) that she had been forced to defend protracted litigation, which tarnished her good name; and (ii) that she had lost the opportunity to sell the Painting. The district court turned a deaf ear to these plaints. *Vineberg,* 529 F.Supp.2d at 311. Because the defendant has not resurrected either argument on appeal, we deem these plaints abandoned. *See United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.1990).

To recapitulate, because the burden of proving laches rests with the proponent of that defense, *Raso,* 884 A.2d at 395 n. 12, the defendant had an obligation to adduce specific evidence of prejudice in order to thwart the plaintiffs' motion for summary judgment. The defendant failed to carry this burden; the record before the district court contained no legally cognizable evidence of prejudice. That is the end of the line. *See Berthiaume v. Sch. Comm. of Woonsocket,* 121 R.I. 243, 397 A.2d 889, 894 (1979) (explaining that "[t]he mere passage of time is insufficient to invoke the defense of laches"); *Chase v. Chase,* 20 R.I. 202, 37 A. 804, 805 (1897) (noting that "[l]aches, in legal significance, is not mere delay, but delay that works a disadvantage to another").

## III. CONCLUSION

A de facto confiscation of a work of art that arose out of a notorious exercise of man's inhumanity to man now ends with the righting of that wrong through the

mundane application of common law principles. The mills of justice grind slowly, but they grind exceedingly fine.

We need go no further. The short of it is that the district court acted well within the realm of its discretion in refusing the defendant's tardy request to reopen discovery. By like token, the court had an appropriate rationale for granting the plaintiffs' motion for *brevis* disposition.[5]

*Affirmed.*

---

5. Execution of the judgment may prove to be a different matter. The record indicates that the Painting is now in Germany, and it is not clear to what extent (if at all) it is still subject to the defendant's control. The plaintiffs, however, have not yet attempted to execute the judgment of replevin, so this issue is not before us.